**STATE of Minnesota, Respondent,**

v.

**Rolland Alvin MOOSE, Appellant.**

**No. 47009.**

Supreme Court of Minnesota.

May 12, 1978.

C. Paul Jones, Public Defender, Philip Marron, Asst. Public Defender and John Hargens, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary Flakne, County Atty., Vernon Bergstrom, David Larson, and Phebe Haugen, Asst. County Attys., Minneapolis, for respondent.

Heard before PETERSON, YETKA, and IVERSON, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Defendant was convicted by a jury in Hennepin County District Court of two counts of aggravated robbery and one count of aggravated assault and was sentenced under Minn.St. 609.11 to 3 to 20 years' imprisonment.[1] On appeal defendant raises three issues concerning, first, his pretrial photographic identification; second, his attempt to obtain his brother's testimony at

---

1. The trial court ruled that the separate counts involved one course of conduct, merging counts two and three into the first count of aggravated robbery.

trial; and third, his sentencing under § 609.11, which provides minimum terms where firearms or dangerous weapons are in the defendant's possession. We affirm the conviction and remand for resentencing.

On the evening of September 28, 1975, defendant, Rolland A. Moose, and several other persons drove to Stasiu's Bar in Minneapolis. One of the group was Patricia Macial, who had known defendant approximately 6 months. She testified that during the drive to the bar she saw a handgun in defendant's possession. After arriving at the bar, she observed defendant playing foosball and sitting at a table until about midnight.

Just before 1 a. m. that evening, Raymond Lind entered Stasiu's Bar, ordered a drink, and walked into the men's restroom. While Lind was standing at the urinal, defendant entered the restroom and approached Lind from the side. Defendant said, "Say," and Lind replied, "Yes," and looked at him. Defendant pulled a revolver from his jacket, put it to Lind's side, and said, "I want your money." Lind testified:

> "* * * At this time he pushed me to the corner where the commode is and at this time I was looking at him and he says, 'Don't look at me.' And I looked at him again. He brought the revolver up to my neck. At this time I was looking at him, the revolver was loaded and he says, 'Don't look at me again.' He hit me on the side of the head, and at this time he put it up to my head. He had it cocked. He says, 'Don't look at me.' At this time he got my wallet, and he says, 'Get down on your knees.' So I got down on my knees. He says, 'Have I got all your money?' I says, 'Yes.'"

Defendant then hit Lind on the top of the head and told him not to move for 10 minutes. Lind testified that at that moment another man (whom he later learned was named Bruce Mount) entered the restroom.

As Mount entered the restroom, someone pointed a gun at his face and told him to get up against the wall. Mount testified that he could not identify his assailant but that he had long black hair and wore a dark coat. Mount saw Lind lying on the floor, and while Mount was standing facing the wall, the assailant took Mount's wallet and went through his pockets. While Mount was standing against the wall, Carl Carlson entered the restroom.

Carl Carlson testified that as he entered the restroom and approached the urinal he was grabbed by a man he could identify only as an Indian male with long black hair. The assailant swung him around and struck him with his pistol on the head. As he raised his arm to protect himself, the assailant again hit him on the head. He then heard his assailant say, "I am going to try to get out of here one way or the other."

The bartender, Clifford Carlson (Carl Carlson's son), and a customer, Thaddeus Swider, saw defendant walk from the restroom followed a few seconds later by a bleeding Carl Carlson. Swider observed defendant "tucking a gun in his pants pocket." Upon seeing his bloodied father, Clifford Carlson called to Swider to stop defendant. Swider pursued defendant until defendant reached the front of the bar. At that point, defendant turned around and pointed his gun toward the bar. This caused Swider and Robert Smoter, another customer who had joined in pursuit, to jump to the side or back off. Apparently defendant then left the bar.

The day after the incident and again on October 23, Lind was shown photographs of 19 Indian males, and both times he identified defendant as the person who robbed him. On October 28 or 29, Clifford Carlson and Swider were separately shown the same photographs and each picked defendant as the person who had preceded Carl Carlson from the restroom and who had drawn a gun on them at the doorway. Patricia Durkot, a waitress at the bar, also examined the photographs and identified defendant as a person she had seen in the bar prior to the robbery. On November 2, Robert Smoter examined the photographs and was "90% sure" that the photograph of defendant depicted the man who had pulled the gun at the barroom doorway. These identifications led to defendant's arrest.

■ 1. We consider first defendant's argument that the pretrial photographic identification violated his right to due process of law. The legal standard for determining whether a pretrial photographic identification comports with due process requirements is well settled:

> "Convictions based on eyewitnesses' identification at trial following a pretrial identification by photographs must each be considered on its own facts and will be set aside only if such pretrial photographic identification procedure 'was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968)." *State v. Winston*, 300 Minn. 314, 317, 219 N.W.2d 617, 619 (1974).

The photographic lineup in this case consisted of photographs of 19 Indian males, including defendant, who looked to be between the ages of 18 and 30. Of the 19 men, 14 had hair as long or longer than defendant's. The remaining five had hair shorter than defendant's. Of the five men with short hair, one man was wearing glasses. Of the 14 men with long hair, defendant was the only man wearing glasses. All of the 19 were similarly dressed.

■ Defendant argues that the identification procedure denied him due process because defendant's photographs were the only ones depicting a man with *both* long hair and glasses. The problem with this argument is that it proceeds by *combining* separate identifying features—eyeglasses and long hair. In any photographic identification procedure, each person depicted will be the only person who satisfies some combination of identifying features. But this does not mean the procedure will be either impermissibly suggestive or likely to give rise to irreparable misidentification. On the facts of the present case, we have no difficulty in holding that the pretrial photographic identification did not deny defendant due process.

2. The second issue raised by defendant concerns his attempt to obtain his brother's testimony at trial. During a pause in the presentation of the state's case, a conference in chambers was held during which defendant stated he did not wish to take the stand in his own defense but desired his brother, Steven Moose, to testify on his behalf. Apparently Steven was in the area the evening of the robberies and to some degree resembled his brother, the defendant. No decision concerning defendant's request was made at the time; however, a subpoena was issued in Steven's name and Attorney Donald Larson was appointed to represent him.

After the state rested, another conference was held in chambers. Present were the trial judge, defendant and his counsel, the prosecutor, and Steven's counsel. Steven's counsel had instructed him to plead the Fifth Amendment in response to any question other than his name. Thus, defendant's counsel sought permission at the conference to put Steven or his picture before the jury as demonstrative evidence, apparently to cast doubt on the identification made by the state's witnesses. The trial judge denied this request, explaining that Steven's mere presence before the jury would lack probative value since he would claim his privilege against self-incrimination rather than testify that he was in the area on the night in question. Defendant replied that his brother told him he would not take the Fifth Amendment. Defendant's counsel responded that Steven's counsel had stated that Steven would claim his privilege. Therefore, defendant's counsel believed the rules of ethics did not permit him to call Steven as a defense witness. The trial judge told defendant, "It is up to your lawyer who is running the case, Mr. Moose." The conference ended and closing arguments began.

On appeal, defendant argues that his defense counsel's decision not to call Steven violated his Sixth Amendment rights to compulsory process and the effective assistance of counsel. The state contends the decision by defendant's counsel was proper under A. B. A. Standards for Criminal Justice, Standards Relating to the Defense

Function (Approved Draft, 1971) § 7.6(c), which states:

> "A lawyer should not call a witness who he knows will claim a *valid* privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege. In some instances, as defined in the Code of Responsibility, doing so will constitute unprofessional conduct." (Italics supplied.) [2]

Defendant argues that there was not an adequate determination of whether Steven could have validly invoked the privilege.

■■■ We reject defendant's argument. Our analysis begins from the well-settled rule that a valid claim of the privilege against self-incrimination under the Fifth Amendment takes precedence over the Sixth Amendment right to compulsory process. *State v. Spencer*, Minn., 248 N.W.2d 915 (1976); *Royal v. State of Maryland*, 529 F.2d 1280, 1283 (4 Cir. 1976); *Johnson v. Johnson*, 375 F.Supp. 872, 875 (W.D.Mich.1974). It is for the trial court to decide whether the witness' claim of the privilege is valid, and in making this decision the court has broad discretion. *Production Credit Assn. of Redwood Falls v. Good*, 303 Minn. 524, 228 N.W.2d 574 (1975); *State v. Beery*, 198 Minn. 550, 270 N.W. 600 (1936). The court should not require the witness to prove the hazard of incrimination in the sense in which a claim is usually required to be established in court, otherwise the witness would be compelled to surrender the very protection which the privilege is designed to guarantee. *Minnesota State Bar Assn. v. Divorce Assistance Assn. Inc.*, Minn., 248 N.W.2d 733, 737 (1976), relying on *Hoffman v. United States*, 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118, 1125 (1951). In appraising the claim of privilege, the trial judge "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." 341 U.S. 487, 71 S.Ct. 818, 95 L.Ed. 1124. Applying that standard to the present case, the record indicates that the trial judge determined that Steven could validly claim a privilege against self-incrimination, and we find no basis for disturbing that determination.

■■■ The question then was whether Steven would in fact claim the privilege. On this question, defendant's trial counsel was entitled to rely on the court's determination that the privilege could be validly invoked and on Steven's counsel's indication that Steven would in fact invoke it. In these circumstances, Steven's privilege against self-incrimination took precedence over defendant's right to compulsory process, and defense counsel's decision not to call Steven was consistent with his ethical obligations and provides no basis for defendant's claim that he was denied the effective assistance of counsel.

■■■ 3. The final issue raised concerns defendant's sentence. The sentencing transcript indicates that the trial court felt bound by Minn.St. 609.11 to impose a minimum prison sentence because defendant used a firearm in the commission of his crimes. However, the sentencing transcript also indicates that in the absence of a minimum-sentence requirement the court would have considered placing defendant on probation pursuant to Minn.St.1976, § 609.135, subds. 1 and 2. We hold that Minn.St. 609.11 did not bar the trial court from considering probation pursuant to Minn.St. 1976, § 609.135, subds. 1 and 2. Section 609.135, subds. 1 and 2, has since been amended [3] to conclusively eliminate the possibility of probation in cases coming under

---

2. The commentary to § 7.6(c) adds: "Although the situation arises more frequently for the prosecutor than it does for defense counsel, it is equally unprofessional for either to call a witness he knows will assert a claim of privilege in order to encourage the jury to draw inferences from the fact that the witness claims a privilege. *If there is genuine doubt whether the witness will claim the privilege or whether the validity of the privilege will be recognized, the matter should be* resolved out of the presence of the jury." (Italics supplied.)

3. Laws 1977, c. 349, § 1.

the minimum-sentence statute. But under the versions of §§ 609.11 and 609.135 governing this case, it appears that the legislature had not yet eliminated the possibility of probation. We therefore remand the case for resentencing, but we intimate no view as to the appropriate disposition on remand.

Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.