STATE of Minnesota, Respondent,

v.

Areece Devon MANLEY, Appellant.

No. C8–01–1833.

Supreme Court of Minnesota.

April 3, 2003.

As Modified on Denial of Rehearing
June 23, 2003.

John M. Stuart, State Public Defender, Roy G. Spurbeck, Assistant State Public Defender, Minneapolis, for Appellant.

Mike Hatch, Attorney General; Susan Gaertner, Ramsey County Attorney, Jeanne L. Schleh, Assistant County Attorney, St. Paul, for Respondent.

## OPINION

PAGE, Justice.

Appellant Areece Manley was indicted by a Ramsey County grand jury and subsequently convicted by a Ramsey County jury of first-degree murder in violation of Minn.Stat. § 609.185(a)(6) (2002), Minnesota's domestic abuse murder statute, and second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2002), for the November 5, 2000, death of his girlfriend, Latisha Froysland. At sentencing, the trial court sentenced Manley to prison "for the remainder of [his] life." In this direct appeal, Manley, through his appellate counsel, raises a number of issues. First, he asserts, relying on *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), that he is entitled to a new trial because the state did not prove beyond a reasonable doubt each predicate act comprising a "past pattern" of domestic abuse. Next, he asserts that the trial court erred when it failed to provide, sua sponte, a cautionary instruction with respect to how evidence related to Manley's past pattern of domestic abuse could be used with respect to the second-degree murder charge. In addition, he asserts that he was deprived of a fair trial due to three evidentiary rulings by the trial court. He also asks this court to review sealed files examined by the trial court in camera to insure that all exculpatory evidence contained within those files was made available to him [1] and to clarify his sentence.[2] Finally, Manley raises a number of issues pro se. We affirm.

1. With respect to this issue, it is enough to say that we have examined the confidential records and are satisfied that there was no error on the part of the trial court.

2. To the extent that the trial court's statement at sentencing can be read as the trial court having sentenced Manley to a life sentence without the possibility of release, that state-

The following facts were established at trial. In early 1999, Manley and Froysland met and started dating. At some point, Manley began living with Froysland and her four children. In October of 2000, Froysland and her children moved to a house located at 426 East Minnehaha Avenue in St. Paul. Manley did not officially move to the new house with Froysland, but did keep his things there. In the early evening on November 5, 2000, three of Froysland's children went to a neighbor's home and told the neighbor that their mother was dead. The neighbor called the police, who responded and found Froysland's body in an upstairs bedroom at the home. Froysland's one-and-a-half-year-old daughter was curled up in the fetal position on her chest crying. That evening, the police interviewed Froysland's five-year-old son, who implicated Manley in his mother's death. The son told the police that he was sleeping and awoke to see his mother and Manley fighting. In addition, he indicated that he saw Manley with a gun in his mother's mouth. When asked how he saw that, he said, "I, I went and walked in. And I heard a gunshot from my mom's room and then saw Reese did it." He also told the police that Manley stole his mother's car when he left the house.

The autopsy on Froysland's body revealed that she had been shot once in the head. There was evidence that she had also been strangled. The medical examiner concluded that Froysland had been killed sometime between 1:00 a.m. and 6:45 a.m. on November 5.

The day before the murder, Steven Michaels, a pastor and the brother of Froysland's ex-husband, talked with Froysland and Manley on the telephone at approximately 11:00 a.m. While talking with Froysland, Michaels could hear Manley in the background yelling. When Manley got on the phone with Michaels, he claimed that Froysland had another man in the house the day before. Between 11:00 a.m. and noon that same day, Froysland, scared and crying, arrived at the home of her cousin, Tanayia Walker. Walker took Froysland back to 426 East Minnehaha to get some clothing for the children. When they arrived, Manley, who was still at the house, attempted to push Froysland into a bedroom and close the door. Walker intervened, and she and Froysland were eventually able to leave the house. After leaving, Froysland dropped Walker off at work with plans for Walker to drive Froysland to Froysland's sister's house in Mankato after Walker's shift ended around midnight. Froysland returned to 426 East Minnehaha with the children.

Around 8:30 that evening, Manley went to the home of the children's babysitter and inquired as to Froysland's whereabouts. The babysitter told Manley she had not heard from Froysland; however, shortly after Manley's departure, the babysitter received a call from Froysland informing her that she would not need a babysitter that evening. Not much else is known about either Froysland's or Manley's other activities on November 4 except that between 5:00 p.m. on November 4 and 1:00 a.m. on November 5 Froysland talked with a number of her friends on the telephone, the last call being at approximately 1:00 a.m.

Between 1:30 and 2:00 a.m. on November 5, Manley arrived at the home of Nicole Adams, a woman he had been in a

ment is in error. Sentencing for those convicted under Minn.Stat. § 609.185(6) is pursuant to Minn.Stat. § 244.05, subd. 4, which provides for a sentence of life imprisonment with the possibility of release after serving a minimum of 30 years. *See* Minn.Stat. §§ 244.05, subd. 4, 609.106, subd. 2, and 609.185(a)(6).

relationship with since July of 2000. According to Adams, Manley left her home at approximately 5:45 a.m., heading for the bus station. On November 7, Adams reported to the police that she had discovered what turned out to be Froysland's car parked in her garage.

From the bus station, Manley took a bus to Kansas City, Missouri, to visit relatives. When Manley's relatives asked why he came to Kansas City alone, Manley told them that something had happened at Froysland's home. He explained that he and Froysland had spent the weekend together at a motel. Upon their return home, he went to the store. When he came home from the store, he found drug dealers at Froysland's home asking her where he was. He heard someone shout, and heard a gunshot. He then ran down the stairs, jumped out a window, and fled.

Also while in Kansas City, Manley attempted to acquire cash using Froysland's Electronic Benefits Transfer card. He asked the boyfriend of a woman who referred to herself as Manley's aunt to assist him in using the card, claiming that he did not know how to use it, although he had used the card without assistance in the past. Following police attempts to locate him in both Kansas City and Minnesota, Manley turned himself in on November 19, 2000.

At trial, several witnesses testified regarding Manley's past abuse of Froysland. Tammy Vaughn testified about a shoving incident in the summer of 1999 at her home. Vaughn testified that Manley shoved Froysland and told her if she called the police he would kill her. Vaughn also testified that she had seen a number of bruises on Froysland's arms and legs during the summer of 1999. Ella Hunter, who occasionally lived with Froysland, testified about an incident in 1999 in which she saw Manley holding a knife to Froysland's

neck, and an incident in 2000 that involved a fight in which Manley was choking Froysland. According to Hunter, these incidents stemmed from Manley's suspicion that Froysland was cheating on him. Tanayia Walker, who also lived with Froysland on occasion, testified that she heard Manley accuse Froysland of cheating on him and say that he would rather have her dead than with another man. Walker also testified that she had seen Manley with a dark-colored handgun.

Froysland's stepfather, Renaldo Walker, testified that on October 16, 2000, Froysland arrived at his house in tears and told him that Manley had beaten her, pulled a gun on her, and forced her into the trunk of her car. According to Walker, Froysland was afraid to call the police. In the end, the police were contacted. The responding officer testified in some detail about the report she took from Froysland regarding the incident with Manley. According to the officer's testimony, at the time Froysland gave the report, Froysland was shaking and choked up. The officer testified that Froysland reported that Manley broke into her home, woke her, and refused to leave. When Froysland offered to drive him anywhere he wanted to go, Manley stated he wanted to go to his mother's house. Froysland drove Manley to the area of his mother's house and told him to get out of the car. In response, Manley pulled a knife on Froysland and made her get into the passenger seat. Later, he forced her into the trunk of the car by showing her a small revolver. He then drove around until the car ran out of gas. When Manley and Froysland walked to a nearby restaurant to call a cab, Manley told her that if she made a scene he would kill her and everyone she loved. The officer took pictures of Froysland's injuries. Those pictures were admitted as evidence

at trial and show Froysland with two black eyes.

In addition, evidence related to an October 12, 2000, order for protection that Froysland obtained against Manley was admitted. That evidence included pictures of the injuries Froysland sustained during the assault that lead to the order for protection. Finally, evidence of Manley's past abuse of a former girlfriend, Tabetha Lee, was admitted.

## I.

▨ Manley argues that the trial court committed reversible error in its instruction to the jury as to the state's burden of proof with respect to the past pattern of domestic abuse under Minn.Stat. § 609.185(a)(6). According to Manley, the state was required to prove beyond a reasonable doubt each act making up the past pattern. In support of this argument, Manley relies on the United States Supreme Court decision in *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). By his argument, he would have this court overturn *State v. Cross*, 577 N.W.2d 721 (Minn. 1998). We decline to do so.

After the parties filed their briefs, but before oral argument in this case, this court issued an opinion in *State v. Kelbel*, 648 N.W.2d 690 (Minn.2002), *cert. denied*, — U.S. —, 123 S.Ct. 1000, 154 L.Ed.2d 919 (2003). In *Kelbel*, we addressed the state's burden of proof under Minn.Stat. § 609.185(5), Minnesota's child abuse murder statute. The language of that statute, other than its reference to a "past pattern of child abuse" instead of a "past pattern of domestic abuse," is for all practical purposes identical to Minn.Stat. § 609.185(a)(6), the domestic abuse murder statute.[3] Under section 609.185(a)(5), a person is guilty of first-degree murder when he or she "causes the death of a minor while committing child abuse when [he or she] has engaged in a past pattern of child abuse." We concluded in *Kelbel* that the state was required to prove the past pattern of child abuse beyond a reasonable doubt, but was not required to prove each predicate act of the "past pattern of child abuse" beyond a reasonable doubt. *Kelbel*, 648 N.W.2d at 703. In reaching that conclusion, we relied in part on our rules of statutory construction, our decision in *Cross*, and the Supreme Court's decision in *Richardson*. First, we noted that we have repeatedly held that when the legislature's intent is clear "statutory construction is neither necessary nor permitted," and that in those situations we will apply the plain meaning of the statute. *Kelbel*, 648 N.W.2d at 701–02 (citing Minn. Stat. § 645.16 (2000)).

We then looked at *Cross*. In *Cross*, we held that the plain language of the domestic abuse murder statute requires "proof only that the murder occurred during an act of domestic abuse, that the perpetrator has engaged in a past pattern of domestic abuse, and that the circumstances of the killing manifest an extreme indifference to human life." *Id.*, 577 N.W.2d at 726–27. While the plain language of the statute alone supported our conclusion in *Cross*,

---

**3.** Minnesota Statutes §§ 609.185(5) and 609.185(a)(6) (2002) read:

(5) causes the death of a minor while committing child abuse, when the perpetrator has engaged in a past pattern of child abuse upon the child and the death occurs under circumstances manifesting an extreme indifference to human life;

(6) causes the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life[.]

such a conclusion was further buttressed by the fact that, in the absence of clear statutory direction, to require proof beyond a reasonable doubt as to each act of the past pattern would "create an unnecessarily heavy burden on the state." *Id.* at 727; *see Kelbel,* 648 N.W.2d at 700.

Our concern in both *Cross* and *Kelbel* was the difficulty of proving domestic abuse and child abuse, and the potential unfairness to the state if it were forced to prove each of the acts constituting a past pattern of abuse beyond a reasonable doubt. *Cross,* 577 N.W.2d at 727, *Kelbel,* 648 N.W.2d at 702. In *Cross,* we explained that the domestic abuse statute "reflects a recognition of the unique characteristics of domestic abuse"—namely, the hidden nature of the violence and the fact that domestic abuse is one of the most underreported crimes. *Cross,* 577 N.W.2d at 727. In *Kelbel,* we recognized that child abuse has the same characteristics. *Kelbel,* 648 N.W.2d at 702–03. Applying our holding in *Cross* to *Kelbel,* we concluded that the child abuse murder statute's similar language led to the same conclusion that we reached in *Cross:* it is the pattern, not the individual acts making up the pattern, that must be proven beyond a reasonable doubt. *Kelbel,* 648 N.W.2d at 702.

We then considered our reasoning from *Cross,* in light of *Richardson,* and concluded that *Richardson's* analytical framework did not dictate a different result. *Kelbel,* 648 N.W.2d at 702. That framework required us to examine Minn.Stat. § 609.185(a)(5)'s "language, tradition, and potential unfairness to a defendant" to determine whether the statute's past pattern language created one or several elements. *Kelbel,* 648 N.W.2d at 702. As discussed above, we concluded that the statute's language creates only one element. *Id.* at 703. In essence, we concluded that the "past pattern" was a means of committing the underlying offense and not the offense itself. *Id.* at 702. We acknowledged the similarities between our "past pattern" language and the "series of violations" language at issue in *Richardson,* noting that both a pattern and a series require more than one incident to occur and both our child abuse murder statute and the continuing criminal enterprise statute considered in *Richardson* require a criminal act to make up the pattern or series. We nonetheless concluded that the two statutes are dissimilar because, "in *Richardson,* the Court failed to find any legal source defining 'violations' as a means of committing an offense rather than the offense itself," while in *Cross,* we concluded that the criminal acts that constitute "domestic abuse" are a means of establishing the required pattern rather than separate elements. *Kelbel,* 648 N.W.2d at 702.

Under *Richardson's* analytical framework, we also considered the tradition underlying the statute. *Richardson* explicitly distinguished sexual abuse statutes because the underlying criminal acts were difficult to prove, and thus those statutes did not require proof of each predicate act. *Kelbel,* 648 N.W.2d at 700 (citing *Richardson,* 526 U.S. at 821, 119 S.Ct. 1707). We reached the same conclusion in *Cross* regarding domestic abuse. 577 N.W.2d at 727. Thus, we noted in *Kelbel* that this *Richardson* factor "weighs against interpreting" the "past pattern" language as creating several elements. 648 N.W.2d at 703.

Finally, although we acknowledged *Richardson's* concerns regarding potential unfairness to a defendant given a jury's possible propensity to ignore the factual details of each criminal act, we held in *Kelbel* that both the plain language of the statute and tradition still weighed against reading "past pattern" as creating several elements. *Id.* Given that our decision in

*Kelbel* rested on our analysis in *Cross* and was not undermined by an application of *Richardson's* analytical framework, whether we approach Manley's contentions by way of the plain language of the domestic abuse murder statute or the analytic framework set out in *Richardson,* our holding today reaches the same conclusion we reached in *Kelbel:* the "past pattern" language found in Minn.Stat. § 609.185(6), Minnesota's domestic abuse murder statute, like the "past pattern" language in Minn.Stat. § 609.185(5), Minnesota's child abuse murder statute, refers to the means of establishing the pattern rather than separate elements of the underlying offense. Thus, we conclude that the trial court did not err in its instructions to the jury on the state's burden of proof with respect to the past pattern of domestic abuse.

## II.

■■■ Manley next claims that the trial court committed plain error when it failed to provide, sua sponte, a limiting instruction with respect to how the evidence admitted to prove the past pattern of domestic abuse was to be used by the jury when considering the second-degree intentional murder charge. When a criminal defendant fails to object to claimed trial errors, our review is for plain error affecting substantial rights. *State v. Griller,* 583 N.W.2d 736, 740–41 (Minn.1998) The three-prong test for plain error requires that there be (1) error, (2) that is plain, and (3) the error must affect substantial rights. *Id.* at 740. Each prong of the test must be met in order for our review to proceed. *Id.* Normally, we would consider each prong of the plain-error test in order, but in this case we need not do so. On its face, Manley's claim fails because he cannot establish that the claimed error affected his substantial rights. We have said that the requirement that the error affect

substantial rights "is satisfied if the error was prejudicial and affected the outcome of the case." *Griller,* 583 N.W.2d at 741. Here, in addition to second-degree intentional murder, Manley was convicted of the greater offense of first-degree murder, which we today affirm. Manley does not challenge the admissibility of the past pattern of domestic abuse evidence as it relates to that offense. Nor can he. It was properly admitted for purposes of establishing an element of that offense. Because the past pattern of domestic abuse evidence was properly admitted for purposes of the first-degree murder offense and because we affirm the conviction for that offense, Manley cannot establish that the admission of that evidence as it relates to his second-degree intentional murder conviction was prejudicial and affected the outcome of the case. Therefore, we have no basis to review this alleged error.

## III.

Manley also asserts that he was deprived of a fair trial when the trial court removed one of the jurors, refused to allow third-party perpetrator evidence, and granted the Fifth Amendment privilege to a witness. We shall address each of these issues in turn.

### A. Removal of Juror

During voir dire, one of the prospective jurors indicated that she had a sister who was a public defender in Ramsey County, where the trial was being held. During questioning about her relationship with her sister and her ability to remain unbiased, the juror stated that she did not feel that her sister's position would influence her during the trial. The juror was ultimately seated.

As the trial went forward, the trial court noted that the juror's sister was frequently

present in the courtroom observing the trial. Concerned that the sister's presence might influence the juror, the trial court, out of the presence of the jury, questioned the sister about her conversations with the juror.[4] The trial court took no action as a result of this questioning, which took place on a Friday. The following Monday, the state expressed concerns about the juror's ability to remain impartial as a result of the sister's presence in the courtroom during trial and the conversations the sister had with the juror regarding the trial. As a result, the trial court questioned the juror out of the presence of the other jurors regarding the juror's ability to remain impartial. During questioning, the juror disclosed that her sister had been driving her to and from court every day. The juror also indicated to the trial court that she was not influenced by her sister's presence. At the end of the questioning, the trial court did not remove the juror, but did remind her of her obligation not to discuss the case with others.

The next morning, the juror approached the trial court and asked to be excused, stating, "I just feel like I could be influenced; and not by my sister, but by my association with my sister * * * [a]nd I'm afraid that could influence me, and I wouldn't be very objective." Thanking her for her candor, the trial court excused the juror from further service and an alternate juror took her place.

Manley argues that the trial court's examination of the juror in the first instance and the juror's eventual removal, without any attempt to rehabilitate the juror, were improper. He also claims that questioning the sister denied him a public trial. In the past, we have not had occasion to address the precise issue presented by this case.

We have addressed the somewhat analogous situation in which, during voir dire, the question arises as to whether a prospective juror should be removed for cause. In those situations, we give great deference to the trial court in making its determination. *See State v. Logan*, 535 N.W.2d 320, 323–24 (Minn.1995); *State v. Graham*, 371 N.W.2d 204, 206–07 (Minn. 1985). We see no reason to treat the circumstances here differently.

The trial court is responsible for ensuring that the trial proceedings are fair. *Pederson v. State*, 649 N.W.2d 161, 164–65 (Minn.2002). When circumstances arise during trial that raise concerns about the fairness of the proceedings, it is appropriate for the trial court to address those concerns.

Here, based on his knowledge that the juror's sister was a Ramsey County public defender, coupled with the sister's presence in the courtroom during trial for extended periods of time, the trial court judge became concerned that the juror might be influenced by the sister's presence. The judge talked to the sister, but took no action. After the state raised concerns about the sister's presence at the trial, the judge talked to the juror. Other than reminding the juror that she was not to talk to anyone about the case, the judge took no action. We see nothing improper in the judge questioning the juror and her sister in an effort to ensure that the sister's presence in the courtroom during trial was not having an impact on the juror's ability to be impartial. Nor do we see anything improper in the judge taking the juror at her word when, indicating that her association with her sister could influence

---

4. The juror's sister told the court that she had asked her sister the name of the defendant. When the juror explained she could not talk about the case, her sister assured her that she was free to reveal the defendant's name, the charges, the judge, and the attorneys.

her and affect her ability to be objective, she asked to be excused.

Manley contends that the trial court should have attempted to rehabilitate the juror following her request for removal. While the judge in the exercise of his discretion might have questioned the juror to see if she could be, as Manley suggests, rehabilitated before excusing her, he was under no obligation to do so. 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 21.3(c) at 729–30 (1984) (cited in *State v. Logan*, 535 N.W.2d 320, 323 (Minn.1995)) (if during voir dire a juror expresses bias, that juror should be excused unless rehabilitated, but nothing suggests that a trial court is under a duty to rehabilitate). Thus, we conclude that the trial court did not abuse its discretion when it excused the juror from further service.

### B. Third–Party Perpetrator Evidence

At trial, Manley claimed that Froysland was murdered by drug dealers who were looking for him. In support of that claim, Manley sought to introduce testimony from an individual who was incarcerated with him at the Ramsey County Adult Detention Center. According to Manley, the individual told his defense investigators that he had overheard a man by the name of Scott admit to killing Froysland. Claiming that he had fabricated the story about Scott, the individual subsequently recanted the story he gave defense investigators.

■ A criminal defendant may introduce evidence that a third party committed the crime of which the defendant is accused. *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn.2000). However, before the defendant is allowed to do so, he or she must first lay a foundation of additional evidence sufficient to connect the alleged third-party perpetrator with the commission of the crime. *Id.* That evidence must be clear and convincing. *See State v. Johnson*, 568 N.W.2d 426, 433 (Minn.1997). The decision to admit such evidence is within the discretion of the trial court and the trial court's decision will not be reversed absent an abuse of discretion. *See, e.g., State v. Stewart*, 643 N.W.2d 281, 292 (Minn.2002). Here, the trial court found that Manley's proffered third-party perpetrator evidence was not clear and convincing and was thus not admissible. Manley now argues that his defense was compromised because the trial court did not allow him to introduce this evidence.

■ The only evidence connecting a third-party perpetrator to Froysland's murder was the statement that the individual who was incarcerated with Manley gave to defense investigators, which the individual subsequently recanted. Once the statement was recanted, there was no evidence in the record sufficient to connect any other individual to Froysland's murder. Therefore, we cannot say that the trial court abused its discretion when it excluded the proffered evidence because it was not clear and convincing.

### C. Fifth Amendment Privilege

■ Manley also maintains that he was prejudiced when the trial court granted the Fifth Amendment privilege against self-incrimination to a possible witness. During voir dire, a hearing was held, and the witness's attorney appeared and indicated that his client was asserting his Fifth Amendment right not to testify. Manley's counsel requested that the court determine if the assertion of privilege was valid. In response, the witness's counsel indicated that he could not reveal his client's reasons for invoking the privilege without violating attorney-client privilege.

■ In this appeal, Manley asserts that the trial court should have examined the witness to determine if he was entitled to invoke the privilege. As we did in *State v. Moose*, 266 N.W.2d 521 (Minn.1978), we reject this argument. Trial courts have broad discretion in deciding whether a claim of privilege is valid. *Id.* at 525. In *Moose*, we stated that the trial court should not require the witness to prove the hazard of incrimination, as to do so would require the witness to "surrender the very protection which the privilege is designed to guarantee." *Id.* There is nothing in the record before us to suggest that the trial court, which is in the best position to appraise the claim of privilege, abused its discretion in allowing the witness to assert the privilege. *See Moose* at 525. Therefore, we conclude that the trial court did not abuse its discretion when it declined to question the witness to determine whether the claim of privilege was valid.

## IV.

Finally, we turn to Manley's supplemental pro se brief, which raises, by our count, 19 separate issues. As an initial matter, the state, in a motion filed July 12, 2002, moved pursuant to Minn. R.Civ.App. Proc. 110.01 and 127 to have this court strike certain portions of Manley's supplemental pro se brief and appendix because the allegations contained therein are not supported by material in the record. The state further contends that those portions of the supplemental pro se brief are nothing more than Manley's attempt to place his version of events before the court without testifying and being subject to cross-examination. Finally, the state contends that, to the extent that Manley's supplemental pro se brief cites any law, the cases do not support the allegations he makes. Specifically, the state requests that we strike numbered paragraphs 2 and 6 of the supplemental pro se brief and pages 19, 20, 22, 23–24, 27, and 29–41 of the supplemental pro se brief, as well as the entire appendix.

■ Our reading of Manley's supplemental pro se brief, coupled with our review of the record, leads us to conclude that the matters contained in paragraphs 2 and 6 from the brief are unsupported by any facts in the record. Therefore, we grant the state's motion to strike with respect to those paragraphs. *See State v. Taylor*, 650 N.W.2d 190, 204 n. 12 (Minn. 2002) (noting that an appellate court may not base its decision on matters outside the record on appeal). As for the remainder of the materials challenged by the state's motion, our review leads us to conclude that they must also be stricken. The challenged pages contain only argument that is unsupported by facts in the record. Further, they contain no citation to any relevant legal authority and therefore we deem them waived. *See State v. Krosch*, 642 N.W.2d 713, 719 (Minn.2002). In addition, the supplemental pro se brief's appendix contains materials that are not a part of the record and therefore are not to be considered by this court. *See Taylor*, 650 N.W.2d at 204 n. 12. As a result, we decline to address five of the issues raised by Manley's supplemental pro se brief.

Manley's remaining allegations are summarized as follows:

1. The trial court impermissibly allowed evidence of prior crimes to be introduced at trial.

2. Allowing videotapes of testimony given by Froysland's sons was reversible error.

3. In admitting the testimony of Froysland's sons, the trial court allowed incompetent and inconsistent statements before the jury.

4.   In admitting the testimony of a police officer who attested to Tabetha Lee's state of mind and injuries, the trial court allowed hearsay before the jury.

5.   Manley was deprived of a fair trial when he was required to communicate with his trial counsel via a third party during the children's closed-circuit testimony.

6.   Manley was prejudiced by statements at trial that both Froysland and Lee were afraid of him.

7.   The trial court committed reversible error by denying the jury the option of a hung jury.

8.   The trial court gave an improper circumstantial evidence instruction.

9.   Manley received ineffective assistance of trial counsel due to defense counsel's failure to object to numerous incidents of prosecutorial misconduct.

10.   Manley received ineffective assistance of appellate counsel due to appellate counsel's failure to dismiss his direct appeal and seek postconviction review.

11.   Manley's indictment did not properly inform him of the penalties under Minn.Stat. § 609.185.

12.   The trial court erred by failing to determine whether Manley's statement was voluntary before submitting it to the jury.

13.   The jury verdict was in error.

14.   The DNA test administered to Manley was faulty.

▆▆▆▆   Issues 1, 4, and 6 involve evidentiary rulings by the trial court. Such rulings fall within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *See State v. Lindsey,* 632 N.W.2d 652, 662 (Minn.2001). With respect to issue 1, we note that Manley does not identify the prior crimes being challenged, nor does he explain how their admission prejudiced him. Given Manley's lack of specificity, his claim has no merit. To the extent that this issue involves the admission of evidence relating to his past pattern of domestic abuse, that evidence was properly admitted to establish an element of the charged first-degree murder offense. Moreover, with respect to issues 4 and 6, as well as issue 1, we have thoroughly reviewed the record and are satisfied that the trial court did not abuse its discretion in admitting any of the challenged evidence.

With respect to issues 2, 3, and 5, Manley challenges several aspects of the testimony given by Frosyland's children. He claims that the trial court erred in allowing videotaped statements the children gave to the police to be played at trial, that the children's testimony was inconsistent and incompetent, and that he was denied his right to confrontation because he was required to view the children's trial testimony via closed-circuit television and because he was unable to communicate directly with his trial counsel during their testimony.

▆▆▆▆   We first address Manley's contention that the trial court erred in allowing the children's videotaped statements to be played at trial. Both Marcus and Michael Froysland were interviewed at the Saint Paul Police Department soon after Froysland's body was found. Manley's trial counsel objected to the use of the videotaped testimony, contending that the statements were inconsistent with the children's trial testimony. The trial court ruled that the videotapes were admissible under Minn. R. Evid. 801(d)1(B) as prior consistent statements, and under Minn. R. Evid. 803(24), the residual hearsay exception. The trial court also relied on a number of Minnesota appellate decisions in support of its ruling.

Minn. R. Evid. 801(d)(1)(B) states that an out-of-court statement is not hearsay if the statement is consistent with the declarant's testimony and helpful to the trier of fact in determining whether the declarant is credible. We have previously noted that the 1990 amendments to this rule were specifically intended to broaden the admissibility of prior out-of-court statements while at the same time ensuring that the testimony is both consistent and helpful to the trier of fact in evaluating the credibility of the witness. *State v. Nunn,* 561 N.W.2d 902, 908 (Minn.1997). Such statements are not automatically admissible. *Id.* at 909. Before they can be admitted, the witness's credibility must be challenged and the statement must bolster the witness's credibility with respect to the challenged aspect. *Id.* Here, each child's credibility was challenged during the child's testimony and the trial court found the videotaped statements to be consistent with the children's trial testimony and helpful to the trier of fact in evaluating the credibility of the witness.

Based on our review of the record, we conclude that the videotaped statements do fall within Minn. R. Evid. 801(d)(1)(B) and were therefore properly admitted. At trial, both children testified and were subject to cross-examination. Manley's trial counsel challenged the credibility of each child, asking if they were confused or if they no longer recalled the events surrounding the death of their mother. Comparing their videotaped statements with their trial testimony, we are satisfied that the videotaped statements corroborated their in-court testimony regarding the death of their mother and were therefore "helpful to the trier of fact in evaluating [their] testimony." *Nunn,* 561 N.W.2d at 909. As a result, we conclude that the trial court did not abuse its discretion in admitting the children's videotaped statements.

Manley next asserts that the testimony offered by the children was both inconsistent and incompetent. He fails, however, to point out significant inconsistencies in the children's testimony. With respect to the children's competency, Manley argues that one child had trouble remembering whether he was seven or eight years old and had brief difficulty determining how to answer the prosecutor's fanciful question ("If I told you I was Daunte Culpepper, would I be lying?").

Because the children were both under ten years of age, the trial court conducted competency hearings to determine their ability to testify. *See* Minn. Stat. § 595.02, subd. 1(m) (2002). The trial court found that both were competent and capable of understanding the difference between truth and falsehood. As we noted in *State v. Lanam,* 459 N.W.2d 656, 660 (Minn.1990), *cert. denied,* 498 U.S. 1033, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991):

> Competency concerns the child's ability to be truthful and to understand the importance of telling the truth in court. It also concerns the child's ability to remember and relate events. Whether a child is easily led goes more to credibility than to competency. Even adults at trial become inconsistent upon cross-examination. It is the jury's province to sort out the inconsistencies and determine credibility, the court's province to determine competency. Where the court is in doubt as to the child's competency, it is best to err on the side of determining the child to be competent.

As with the trial court's admission of the children's videotaped statements, we are satisfied that the trial court did not abuse its discretion when it permitted the children to testify at trial.

Finally, Manley contends that he was deprived of a fair trial when he was required to view the children's testimony via closed-circuit television and communicate with his trial counsel via another lawyer during that testimony. In this case, the trial court made a determination that, having been witness to Manley's murder of their mother, the children were sufficiently traumatized as to be unable to testify in Manley's presence. As a result, the trial court required that the children's testimony would be taken pursuant to the arrangement about which Manley now complains. Minnesota's statutory scheme anticipates such situations. *See* Minn. Stat. § 595.02, subd. 4(2)(c) (2002). Section 595.02, subdivision 4(2)(c), provides:

> If the court, upon its own motion or the motion of any party, finds in a hearing conducted outside the presence of the jury, that the presence of the defendant during testimony taken pursuant to this subdivision would psychologically traumatize the witness so as to render the witness unavailable to testify, the court may order that the testimony be taken in a manner that:
>
> (1) the defendant can see and hear the testimony of the child in person and communicate with counsel, but the child cannot see or hear the defendant; or
>
> (2) the defendant can see and hear the testimony of the child by video or television monitor from a separate room and communicate with counsel, but the child cannot see or hear the defendant.

We are satisfied that requiring Manley to view the children's testimony via closed-circuit television and to communicate with his trial counsel during that testimony through another lawyer was permitted by Minn.Stat. § 595.02, subd. 4(2)(c), and did not deny him a fair trial. Moreover, Manley did not object to the arrangement at trial, and the matter can properly be deemed waived upon appeal. *See State v. Litzau,* 650 N.W.2d 177, 182 (Minn.2002).

Issues 7 and 8 challenge jury instructions given by the trial court. In each case, the trial court gave the recommended jury instruction from the jury instruction guide. Manley's argument as to why the instructions given were improper is not supported by the law. Absent such support, we conclude that the instructions as given were proper.

Issues 9 and 10 assert that Manley was denied effective assistance of counsel. In order to prevail on such a claim, Manley "has the burden of demonstrating that (1) his counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that the outcome would have been different but for counsel's errors." *State v. Ture,* 632 N.W.2d 621, 632 (Minn.2001). Manley alleges numerous instances of ineffective assistance, but fails to point to anything in the record to support those allegations. As a result, he fails to meet either of the requirements for establishing an ineffective assistance of counsel claim. Moreover, our review of the record satisfies us that Manley was not denied the effective assistance of counsel as asserted.

With respect to the remainder of Manley's pro se claims, we have thoroughly reviewed the record and conclude that those claims have no merit.

Affirmed.