*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-0806
A13-1186**

State of Minnesota,
Respondent,

vs.

Alex Cennedi Closmore,
Appellant.

**Filed August 25, 2014
Affirmed
Chutich, Judge**

Ramsey County District Court
File No. 62-CR-12-4141

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Chutich, Presiding Judge; Johnson, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

Appellant Alex Cennedi Closmore challenges his convictions of second-degree assault, terroristic threats, and aggravated stalking, asserting that the district court erred

by (1) removing a seated juror based on speculation that the juror's obsessive compulsive disorder (OCD) might make him unable to serve during deliberations; (2) failing to give additional jury instructions regarding the intent required for second-degree assault following a question from the jury; and (3) sentencing Closmore on both the second-degree-assault and aggravated-stalking charges because both offenses could have arisen from a single behavioral incident. Because we conclude that the district court did not err in removing the seated juror, instructing the jury, or sentencing Closmore, we affirm.

## FACTS

Around 5:30 p.m. on May 20, 2012, V.L. left her parents' home to pick up her roommate for a meeting. As she was leaving, V.L. noticed that Closmore was parked down the street. V.L. had recently ended her "rocky" two-and-one-half-year relationship with him. Closmore followed V.L., blocked her car, and got out of his SUV, yelling at her that "he want[ed] to talk." V.L. agreed to talk to Closmore in a nearby park. Closmore got into V.L.'s car, and they argued. V.L. said that she needed to go to a meeting, but Closmore refused to leave. V.L. called 911, and only then did Closmore leave the car and drive away.

After picking up her roommate, V.L. again noticed that Closmore was following her. Closmore pulled his SUV alongside V.L.'s car at a stop sign and started screaming at her. V.L. again called 911. According to V.L., she attempted to make a right-hand turn, but Closmore "sped up and hit my car intentionally." Closmore jumped out of his SUV and started pounding on V.L.'s window. V.L. testified that she was afraid that Closmore was going to kill her.

2

A witness, C.H., testified that he pulled up behind V.L.'s car at the stop sign. Closmore's SUV was to the left of V.L.'s car and was facing the same direction. C.H. overheard a "discussion between the occupants of the two vehicles," which he characterized as "not friendly" and a "heated exchange." When V.L. started to turn right, C.H. witnessed Closmore drive his SUV into V.L.'s car with "a fair amount of speed." C.H. then witnessed Closmore jump out of his SUV "in a rage." C.H. testified that, in his opinion, the crash was "not an accident" because Closmore made a "tight turn" with "significant speed" directly into V.L.'s car.

Police officers arrived on the scene, arrested Closmore, and discovered two knives on the back seat of Closmore's SUV within the reach of the driver. Closmore was charged with (1) second-degree assault with a dangerous weapon; (2) terroristic threats; and (3) aggravated stalking. *See* Minn. Stat. §§ 609.222, subd. 1, .713, subd. 1, .749, subds. 2(2), 3(a)(3) (2010).

The jury convicted Closmore of all three charges. The district court then sentenced Closmore to 24 months in prison on the aggravated-stalking charge and 51 months in prison on the second-degree-assault charge, but did not impose a sentence on the terroristic-threats charge because "it arises from the same behavioral incident as the stalking charge." This appeal followed.[1]

---

[1] Closmore filed a second appeal from a later order requiring him to pay restitution to V.L., and we consolidated the appeals. But Closmore does not challenge the restitution order in this consolidated appeal.

# DECISION

## I.    Juror Removal

Closmore first challenges the district court's removal of a seated juror over his objection, arguing that the district court improperly speculated that the juror's OCD may make him unable to deliberate.  Because the record shows that the district court properly removed the juror in question, we reject Closmore's contention.

At jury selection, the district court asked: "Any of you have any problem with vision or hearing, [or] any other health condition that would make it difficult or uncomfortable for you to serve as a juror?"  Juror P.H. responded:

> P.H.: I stutter.
> THE COURT: Okay. Beyond that, no other problems?
> P.H.: Correct.

P.H. was sworn in as a member of the jury panel, and the jury was sent home for the day. The next morning, before any proceedings occurred, P.H. told the judge that he needed to speak with him.  The following exchange took place on the record:

> THE COURT: So if you could tell us what your concerns are,
> and then we'll go from there.  Okay.
> P.H.: So I forgot to mention a medical condition.  And that is
> that I have [been] diagnosed [with] clinical obsessive
> compulsive disorder.
> THE COURT: Have you been diagnosed with this?
> P.H.: Yes.
> THE COURT: By a doctor?
> P.H.: Correct. Yeah.
> THE COURT: How would that affect your service as a juror
> in this case?
> P.H.: I think that I wouldn't be able to reach a verdict.  But
> that I will obsess about the case.  And that's last night.

THE COURT: You feel that would affect your ability to reach a decision on the case?

P.H.: No. But the case might, or will, affect me.

THE COURT: After.

P.H.: Beyond. Yeah.

THE COURT: In what way?

P.H.: Are you familiar with OCD?

THE COURT: Uh-huh. But you could reach a verdict. You're concerned about how you're going to react after. Am I right?

P.H.: Or, in the process and also afterwards.

THE COURT: How would it affect you, though?

P.H.: I guess that I obsessively worry. And currently a form of my OCD is contamination. And so.

. . . .

THE COURT: Would this affect you physically in some way?

P.H.: It would cause me, well, I guess not physically. But it might kind of . . . paralyze me. Not physically, but it has, I guess, mentally.

THE COURT: Okay.

P.H.: So I don't know what my response will be. But I started worrying last night. And I just wanted to raise my concerns, sir.

. . . .

DEFENSE ATTORNEY: And sir, I'm wondering, if you could remain as a juror and see how things are going, and if there was the same concern tomorrow, you could bring it up again? Or do you think [there is] the possibility that maybe by tomorrow you wouldn't be so concerned about the things you mentioned?

P.H.: Yeah. I would say that that is an option. But I also don't want to delay the trial if I need to leave. But that's okay. I would be willing to do that, though. But being that this is the start of the trial, I thought that this would be the best time.

The state moved to excuse P.H. for cause, explaining that he turned bright red as he was

talking and that his knuckles turned white as he was "grabbing" onto something in the

courtroom.   Closmore's attorney objected to P.H.'s removal.   But the district court removed P.H., explaining:

> Counsel, I'm going to let him go.  I think the risk is too great as far as the trial is concerned.  I'm concerned that something might happen during deliberations.  But more importantly to him, I'm concerned about him.  And I think he's under a lot of stress.  And I think the stress level does not diminish as the trial goes on.  It gets worse and worse and worse. . . . I just don't think that he's capable of handling the situation, given his medical diagnosis.

Among other requirements, a juror must be "physically and mentally capable of rendering satisfactory jury service."  Minn. R. Gen. Pract. 808(b)(5).  A juror who is physically or mentally incapable of serving "may be challenged for cause."  Minn. R. Crim. P. 26.02, subd. 5(1)(4).  We review the district court's factual determination that P.H. was not mentally capable of serving as a juror for clear error.  *See State v. Berrios*, 788 N.W.2d 135, 140 (Minn. App. 2010) (applying clear error to a factual determination regarding a juror's ability to understand English, another rule 808(b) requirement for jury service), *review denied* (Minn. Nov. 16, 2010).  Then, we "consider whether the district court abused its discretion by removing the juror and replacing [him] with the alternate." *Id.*  "If a juror becomes unable to serve, an alternate juror must replace that juror."  Minn. R. Crim. P. 26.02, subd. 9.

This court has previously analyzed the removal of a juror who did not meet the requirements of rule 808(b).  In *Berrios*, we determined that the district court's factual finding that the juror could not understand some of the testimony was "well supported by the record" because the district court and both attorneys questioned the juror under oath

and the juror admitted that she could not understand some of the testimony. 788 N.W.2d at 140. Therefore, the district court's factual finding was "not clearly erroneous." *Id.*

Closmore argues that, instead of determining that P.H. was "unable to serve," *see* Minn. R. Crim. P. 26.02, subd. 9, the district court removed P.H. because he "might" be unable to deliberate in the future. We disagree. As in *Berrios*, both the district court and Closmore's attorney questioned P.H. about his condition on the record. *See* 788 N.W.2d at 140. During this discussion, P.H. mentioned his medical diagnosis, the fact that he had already started to worry about the case, and his fear that the case would "paralyze" him. The prosecutor noted that P.H.'s color turned to bright red as he was talking and that his knuckles turned white as he was "grabbing" onto something in the courtroom. Given the record, the district court did not remove P.H. due to speculation that he "might" be unable to deliberate. And the district court did not clearly err in determining that P.H. was not mentally capable of serving as a juror. *See State v. Verdon*, 757 N.W.2d 879, 883 (Minn. App. 2008) ("Findings are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made." (quotation omitted)), *review denied* (Minn. Feb. 25, 2009).

Moreover, the district court did not abuse its discretion in removing P.H. as a juror. *See Berrios*, 788 N.W.2d at 140 (holding that the district court did not abuse its discretion by removing a seated juror because rule 26.02, subdivision 9, requires that an alternate juror replace a disqualified juror). A district court may remove a seated juror even when a trial is underway to ensure that the proceedings are fair. *See State v. Manley*, 664 N.W.2d 275, 284–85 (Minn. 2003) (holding that the district court did not

7

abuse its discretion in removing a juror after several days of trial when the juror stated that her sister's position as a public defender was influencing her ability to be objective); *Berrios*, 788 N.W.2d at 138, 140 (holding that the district court did not abuse its discretion in removing a juror on the second day of trial after she admitted being unable to understand some parts of the testimony). Here, unlike those cases in which testimony had been received, the district court removed P.H. at an even better time—before the start of the trial. And the district court was not obligated to require P.H. to serve for one day of the trial, as Closmore requested. *See Manley*, 664 N.W.2d at 285 (stating that a district court is under no obligation to "rehabilitate" a juror). Overall, the district court did not clearly err or abuse its discretion in removing P.H. as a juror and in replacing him with the alternate.[2]

## II.    Jury Instructions

Closmore next argues that the district court erred in failing to provide an additional jury instruction after the jury asked a question that showed that it did not understand the intent required for second-degree assault. Closmore does not challenge the jury instructions for the other charges. We conclude that the district court did not err in its instructions on second-degree assault.

With agreement by the parties, the district court instructed the jury regarding the elements of second-degree assault and defined an assault as "an act done with intent to

---

[2] Because we conclude that the district court did not abuse its discretion in removing P.H. as a juror before the start of the trial, we need not address the state's argument that any error here was not prejudicial or Closmore's argument that any error was structural and requires a new trial.

8

cause fear of immediate bodily harm or death in another." *See* 10 *Minnesota Practice*, CRIMJIG 13.10 (2006). But the district court did not specifically define the phrase "with intent to." *See* Minn. Stat. § 609.02, subd. 9(4) (2010) (defining "with intent to" as "a purpose to do the thing or cause the result specified, or [a belief] that the act, if successful, will cause that result"). The jury later submitted a question to the district court, asking:

> If we agree that the defendant intended to hit the car *and* we believe that [V.L.] was in fear of bodily harm, is that sufficient? Or do we need to prove his intention to *use* the car to *cause* fear of *bodily harm*? Or have we met [the] burden of proof?

(Emphasis in original). The district court then had the following discussion with the parties:

> THE COURT: Counsel, we've talked a little bit here. I don't know that I need to give them any more information than they already have. I've looked at the assault instruction that I gave them. And . . . they should be able to work through that. And at most, as I mentioned, I would perhaps reread the assault in the second degree elements to them. And that's the extent of it. What's your preference . . . ?
> PROSECUTOR: I would like the court to reread the elements to the jury. But I agree that the instruction should stand.
> THE COURT: Just reread the instruction and no further comment?
> PROSECUTOR: Correct.
> THE COURT: Okay. Mr. [defense attorney], what do you think?
> DEFENSE ATTORNEY: That's my request too.
> THE COURT: Very well. Okay. Let's bring the jury in, please.

The district court reread the elements of second-degree assault to the jury, including the explanation that "[a]n assault is an act done with intent to cause fear of immediate bodily

harm or death in another." Almost immediately after the district court reread the relevant portion of the instructions, the jury reached its guilty verdicts.

Because Closmore failed to object to the jury instruction at trial, we review the jury instruction under the plain-error standard. *State v. Vance*, 734 N.W.2d 650, 655 (Minn. 2007), *overruled on other grounds by State v. Fleck*, 810 N.W.2d 303 (Minn. 2012). Under this standard, there must be an error, that is plain, and that affects the substantial rights of a party. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). "If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

"An instruction is in error if it materially misstates the law." *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001). And "[a]n error is plain if it is clear or obvious." *Vance*, 734 N.W.2d at 658 (quotations omitted). A district court has "considerable latitude in selecting the language of jury instructions." *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002). If the jury asks a question regarding a point of law, the district court "has the discretion to decide whether to amplify previous instructions, reread previous instructions, or give no response at all." *State v. Laine*, 715 N.W.2d 425, 434 (Minn. 2006) (quotation omitted); *see also* Minn. R. Crim. P. 26.03, subd. 20(3).

We conclude that the district court did not err, much less plainly err, when instructing the jury regarding the second-degree-assault charge. The district court properly defined the elements of second-degree assault. *See Kuhnau*, 622 N.W.2d at 556 (explaining that jury instructions are erroneous if they fail to define the crime charged); *State v. Blawat*, 399 N.W.2d 671, 673 (Minn. App. 1987) (holding that the standard

10

instruction adequately defines the elements of second-degree assault). It then, with agreement of both attorneys, exercised its discretion to reread the previous jury instructions in response to the jury's question. *See Laine*, 715 N.W.2d at 434.

Moreover, the repeated instructions adequately answered the jury's question. In *State v. Harwell*, the appellant similarly argued that the jury should have received an additional instruction regarding intent in response to its question. 515 N.W.2d 105, 108 (Minn. App. 1994), *review denied* (June 15, 1994). But this court explained that the jury instructions and the closing arguments "adequately informed the jury that it had to find that appellant [acted] intentionally," and "[t]he jurors' verdict indicates that they resolved whatever questions they initially had." *Id.* at 108–09. Here, the jury asked if it had to find that Closmore intended to use his SUV to cause V.L. to fear bodily harm. In response, the district court stated that "[a]n assault is an act done with intent to cause fear of immediate bodily harm or death in another." As in *Harwell*, the instruction "adequately informed the jury that it had to find that [Closmore acted] intentionally" and sufficiently answered the jury's question. *See id.*

Because the district court provided adequate jury instructions and exercised its discretion to reread those instructions following the jury's question, the jury instructions were not plainly erroneous. *See State v. Crims*, 540 N.W.2d 860, 864–65 (Minn. App. 1995) ("[A] [district] court may properly refer to its initial charge when that charge provides the jury with the guidance necessary to resolve its confusion."), *review denied* (Minn. Jan. 23, 1996).

11

## III.    Sentencing

Finally, Closmore argues that the district court erred in sentencing him on both the second-degree-assault and aggravated-stalking charges because, under the state's theory of the case, both offenses could have arisen from a single behavioral incident. Closmore raises this issue for the first time on appeal. But failure to raise this issue at sentencing does not preclude relief on appeal. *See State v. Johnson*, 653 N.W.2d 646, 651 (Minn. App. 2002).

"[I]f a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses . . . ." Minn. Stat. § 609.035, subd. 1 (2010). "The state has the burden to establish by a preponderance of the evidence that the conduct underlying the offenses did not occur as part of a single behavioral incident." *State v. Williams*, 608 N.W.2d 837, 841–42 (Minn. 2000). To determine whether "two intentional crimes are part of a single behavioral incident, we consider factors of time and place and whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective." *State v. Bauer*, 792 N.W.2d 825, 828 (Minn. 2011) (quotation omitted). "Whether multiple offenses arose out of a single behavior[al] incident depends on the facts and circumstances of the particular case." *State v. Bookwalter*, 541 N.W.2d 290, 294 (Minn. 1995).

"[T]he district court's determination of whether multiple offenses constitute a single behavioral incident is a factual determination that we will not disturb unless clearly erroneous." *State v. O'Meara*, 755 N.W.2d 29, 37 (Minn. App. 2008). When the relevant facts are not in dispute, whether multiple offenses arose from a single behavioral

12

incident is a question of law subject to de novo review. *State v. Marchbanks*, 632 N.W.2d 725, 731 (Minn. App. 2001). Here, the district court found that the terroristic-threats charge "arises from the same behavioral incident as the stalking charge" and declined to impose a sentence on that charge. But the district court imposed sentences for both aggravated stalking and second-degree assault. Therefore, the district court made an implicit determination that these two offenses were not part of a single behavioral incident. This factual finding is not clearly erroneous. *See O'Meara*, 755 N.W.2d at 37.

During her closing argument, the prosecutor argued that Closmore's SUV was the dangerous weapon required for a second-degree-assault conviction because Closmore used it to "ram[] into another vehicle [which] can produce death." She then argued that the dangerous weapon for an aggravated-stalking conviction was either the two knives in the backseat of the SUV or the SUV itself. In convicting Closmore of aggravated stalking, the jury did not specify whether it found the dangerous weapon to be the knives or the SUV. Nevertheless, the jury's decision to convict Closmore of both assault and aggravated stalking was proper. *See State v. Begbie*, 415 N.W.2d 103, 106 (Minn. App. 1987) ("[U]nanimity is not required with respect to the alternative means or ways in which the crime can be committed." (quotation omitted)), *review denied* (Minn. Jan. 20, 1988).

Closmore argues that, if the jury concluded that the SUV was the dangerous weapon, the stalking could have occurred at the same time and place as the second-degree assault, and the crimes could have arisen from a single behavioral incident. *See Bauer*, 792 N.W.2d at 828. We disagree.

13

Closmore was charged with stalking in violation of Minnesota Statutes section 609.749, subdivision 2(2), which criminalizes "follow[ing], monitor[ing], or pursu[ing] another, whether in person or through any available technological or other means." Unlike assault, which occurs at a fixed place in a fixed moment in time, stalking involves activity that occurs over a period of time at more than one location. The state presented evidence at trial that Closmore followed, monitored, or pursued V.L. throughout the day of the assault and over multiple locations (from her parents' home, to a park, and finally to the intersection where the assault occurred). Therefore, the district court did not err in implicitly finding that the time and place of the stalking and assault charges were not the same. *See Bauer*, 792 N.W.2d at 828.

More importantly, stalking and assault do not involve the same motivation. *See id.* Assault-fear is a specific-intent crime requiring an "intent to cause fear in another of immediate bodily harm or death." Minn. Stat. § 609.02, subd. 10(1) (2010); *see also Fleck*, 810 N.W.2d at 308–09. In contrast, stalking is not a specific-intent crime. Minn. Stat. § 609.749, subd. 1a (2010). Stalking requires that "the actor knows or has reason to know" that the behavior would cause the victim "to feel frightened, threatened, oppressed, persecuted, or intimidated." *Id.*, subd. 1 (2010). While assault-fear requires a specific intent to cause fear, stalking requires knowledge that the victim would feel one of five different emotions. *See id.* Moreover, Closmore was not charged with stalking in violation of section 609.749, subdivision 2(1), which would have required "a purpose or intent to injure" V.L. or her property. When following, monitoring, or pursuing V.L., Closmore was not motivated by a specific intent to cause her fear of immediate bodily

14

harm or death. Therefore, his motivation when stalking V.L. was different than his motivation in assaulting her at the intersection.

Because Closmore was charged with stalking under section 609.749, subdivision 2(2), and because the record supports the district court's determination that the stalking and assault charges involved different times, places, and motivations, *see Bauer*, 792 N.W.2d at 828, the district court did not clearly err in finding that the charges did not arise from a single behavioral incident. *See O'Meara*, 755 N.W.2d at 37. Therefore, we affirm Closmore's convictions and sentences.

**Affirmed.**