*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-1308**

State of Minnesota,
Respondent,

vs.

Ashimiyu Gbolahan Alowonle,
Appellant.

**Filed August 24, 2015**
**Affirmed in part, reversed in part, and remanded**
**Hooten, Judge**

Hennepin County District Court
File No. 27-CR-13-40770

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Hooten, Presiding Judge; Halbrooks, Judge; and

Toussaint, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**HOOTEN**, Judge

Appellant was convicted of multiple counts of being a prohibited person in possession of a firearm and unlawful possession of a firearm for the benefit of a gang. On appeal, appellant argues that: (1) the evidence is insufficient to support the convictions because the circumstances proved do not eliminate the rational hypothesis that appellant did not constructively possess the firearms; (2) the prosecutor committed misconduct by misstating the presumption of innocence during his closing argument; (3) the district court erred in admitting a photograph of appellant's tattoo as character and propensity evidence; (4) the district court's jury instructions materially misstated the doctrine of constructive possession; (5) the district court erred by refusing to suppress testimony as a sanction for the state's intentional discovery violation; and (6) the district court unlawfully convicted him of a lesser-included offense. We affirm in part, reverse in part, and remand.

**FACTS**

In connection with the December 2013 execution of a search warrant and the recovery by police of several firearms, a large amount of ammunition, and cocaine from a Minneapolis residence, respondent State of Minnesota charged appellant Ashimiyu Gbolahan Alowonle with one count of being a prohibited person in possession of a firearm. The state amended its complaint on May 2, 2014, shortly before trial, and charged appellant with a total of seven counts: three counts of being a prohibited person in possession of a firearm for the benefit of a gang, each connected to one of the three

2

locations in the residence where police found firearms (counts 1–3); three counts of being a prohibited person in possession of a firearm, each similarly connected to a location in the residence where firearms were discovered (counts 4–6); and one count of fifth-degree possession of a controlled substance (count 7). A jury trial was held in May 2014, and the following facts were adduced at trial.

On November 3, 2013, Tyrone Washington was shot and killed at a nightclub in downtown Minneapolis. Washington had been a leader of 1-9 Block Dipset, a gang based in north Minneapolis. Appellant, a fellow member of 1-9 Block Dipset and a close friend of Washington, witnessed the shooting and carried Washington's body out of the nightclub. According to prison telephone calls between appellant and incarcerated members of 1-9 Block Dipset shortly after Washington's death, appellant sought to violently retaliate against the rival gangs he believed to be responsible for the murder. As of May 2014, no one had been charged in connection with Washington's murder.

The key witness for the prosecution was B.T., who agreed to testify against appellant as part of a plea bargain with the state. B.T. was not a member of 1-9 Block Dipset, but she had known appellant "forever" and began letting appellant and other gang members visit her residence in north Minneapolis around the end of October 2013. Appellant and other gang members would often come and go from the house as they pleased, although B.T. mainly had contact with appellant. Appellant did not have a key to B.T.'s residence, but another gang member did. Because B.T. had young children, she sometimes became irritated with the amount of activity at her residence and at one point offered to move out and let appellant have the house.

3

B.T. had previously seen appellant in possession of a gun and had overheard appellant instruct someone to meet him to get a gun. But, she claimed ignorance as to "who was putting what where" regarding firearms that were stored in her house, although at one point she told appellant to have people who brought firearms into her house to place them in a cabinet drawer. B.T. further testified that she had told the prosecutor that appellant was responsible for putting guns in the basement. However, she clarified at trial that she also saw other gang members going into the basement and could not verify that appellant was the only individual responsible for those firearms. She volunteered that appellant was "responsible for his friends," that she had nothing to do with the firearms in the basement, and that any firearms in a dining room cabinet were accessible to any member of the gang.

On December 2, 2013, Minneapolis police pursued an armed robbery suspect into B.T.'s residence. The police searched the home, discovering one firearm in the basement and a box of ammunition in a purse in B.T.'s bedroom. B.T., the armed robbery suspect, and at least one other member of 1-9 Block Dipset were present during this search, but appellant was not at the residence at that time.

Also in early December, a confidential informant told police that 1-9 Block Dipset was using B.T.'s residence to store weapons and ammunition in preparation for its retaliation against a rival gang for the death of Washington. The informant identified three gang members, including appellant, who were using the residence for this purpose, and further provided that appellant was responsible for supplying the gang with firearms. Minneapolis Police Officer George Peltz prepared a search warrant for the residence

4

based on this information on December 5, but police did not immediately execute it. Officer Peltz indicated that he instead periodically conducted surveillance of the house before executing the warrant, during which he observed several individuals entering and leaving the residence but did not see appellant.

Officers executed the search warrant on the evening of December 12, 2013, by forcefully gaining entrance into the residence. They encountered eight or nine adults inside, including appellant and B.T. Upon the officers' entry, appellant fled from the house's dining room into the kitchen and was then detained. Once the residence was secured, officers searched the house and found several firearms. In a bedroom on the first floor, near the kitchen, one of the officers observed the butt of a handgun sticking out of the pocket of a jacket on the bed. The firearm was recovered by police and determined to be a 9mm handgun. Police also found a set of keys in the jacket, which contained two electronic fobs that Officer Peltz later determined were linked to appellant's membership at the public library and a gym. B.T. testified that this jacket belonged to appellant, although others sometimes wore it, and she previously told officers that appellant had been wearing this jacket when he arrived at the residence that evening, "shortly" before police executed the search warrant. The prosecution also introduced a photograph from November 30, 2013, that showed appellant wearing the jacket. Police later found cocaine in the jacket when it was being inventoried.

Officers discovered more firearms elsewhere in the residence. Three handguns were found in the basement of the house: one in the ceiling rafters and two in a box underneath a set of stairs. Officers found three more handguns in two drawers of a

5

built-in cabinet in the dining room. In a detached garage next to the residence, police also found two backpacks containing a large amount of ammunition.

Police conducted forensic testing on the various items seized. No fingerprint evidence was obtained from the firearms, and the latent fingerprints obtained from the ammunition and other items found in the garage did not match appellant but did match several other individuals. DNA testing revealed a mixture of DNA on each of the firearms, but appellant was only included as a possible source of DNA for the handgun that was found in the jacket in the back bedroom. However, due to the mixture of DNA on that handgun, the forensic scientist testified that more than 84% of the general population could possibly have contributed DNA to the sample in question.

The jury returned a verdict of guilty on the six firearm-related charges, but found appellant not guilty of fifth-degree possession of a controlled substance. The district court sentenced appellant to concurrent 72-month sentences for each of his convictions under counts 1–3 and 60-month sentences for each of his convictions under counts 4–6, and provided that counts 4–6 "merged" into counts 1–3. This appeal followed.

**D E C I S I O N**

**I.**

Appellant argues that the evidence regarding his constructive possession of the firearms seized by police is insufficient to support his convictions. Appellant challenges only the possession elements of his three convictions under Minn. Stat. § 624.713, subd. 1(2) (2012) (prohibiting possession of firearms by a person convicted of a crime of violence) and his three convictions under Minn. Stat. § 609.229, subd. 2 (2012)

6

(prohibiting the commission of a crime for the benefit of a criminal gang). "To obtain a conviction under [section 624.713], the state must establish either actual or constructive possession of a firearm." *State v. Porter*, 674 N.W.2d 424, 427 (Minn. App. 2004).

It is uncontroverted that appellant was not in actual possession of the firearms police discovered at B.T.'s residence. The state thus had to prove appellant's constructive possession of the firearms by showing that either (1) "the prohibited item was found 'in a place under defendant's exclusive control to which other people did not normally have access,' or (2) if the prohibited item was found 'in a place to which others had access, there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it.'" *State v. Salyers*, 858 N.W.2d 156, 159 (Minn. 2015) (quoting *State v. Florine*, 303 Minn. 103, 105, 226 N.W.2d 609, 611 (1975)). Because the state does not argue, and the record does not show, that the firearms were in a place under appellant's exclusive control, we need only consider whether the state proved beyond a reasonable doubt that there was a "strong probability" that appellant exercised "dominion and control" over the firearms found at B.T.'s house. *See State v. Sam*, 859 N.W.2d 825, 833 (Minn. App. 2015). "We look to the totality of the circumstances in assessing whether or not constructive possession has been proved." *State v. Denison*, 607 N.W.2d 796, 800 (Minn. App. 2000), *review denied* (Minn. June 13, 2000).

In support of its possession charges against appellant, the state presented circumstantial evidence of appellant's constructive possession of the firearms. We apply a two-step analysis when reviewing the sufficiency of circumstantial evidence: (1) we

identify the circumstances proved; and (2) we then "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Silvernail*, 831 N.W.2d 594, 598–99 (Minn. 2013) (quotations omitted). We first examine what circumstances were proved at trial. "In identifying the circumstances proved, we defer, consistent with our standard of review, to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotations omitted). In short, "we consider only those circumstances that are consistent with the verdict." *Silvernail*, 831 N.W.2d at 599.

The circumstances proved at trial are: (1) appellant was a high-ranking member of the 1-9 Block Dipset gang; (2) a fellow gang leader had recently been murdered and appellant had threatened retaliation against the gangs he believed were responsible; (3) at the end of October 2013, B.T. began letting appellant and other gang members visit her home and knew that they might keep firearms there; (4) B.T. had seen appellant with a gun but had not seen him store firearms in the house; (5) B.T.'s home was searched by police on December 2, 2013, who recovered one firearm and some ammunition but did not encounter appellant; (6) police obtained a search warrant for B.T.'s residence after learning that the gang was storing guns there and that appellant was responsible for supplying the weapons; (7) police conducted surveillance at B.T.'s house prior to executing the warrant and did not observe appellant entering or exiting the house; (8) upon executing the warrant on December 12, 2013, police found appellant and several other adults inside the home; (9) appellant tried to flee toward the back of the house when

8

police first entered; (10) police recovered one handgun and a small bag of cocaine from a jacket in a back bedroom; (11) B.T. had seen appellant in this jacket shortly before police arrived, and the jacket contained key fobs that were linked to appellant; (12) police recovered three handguns from the house's basement and three handguns from a dining room cabinet, along with ammunition; (13) DNA testing indicated that appellant was a potential source of the DNA found on the handgun recovered from the jacket in the bedroom; and (14) forensic testing did not link appellant to the other firearms or ammunition.

Next, we determine whether these circumstances proved are both consistent with guilt and inconsistent with any rational hypothesis *except* that of guilt. *Id.* "Circumstantial evidence must form a complete chain that, as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011). We give no deference to the jury's choice between reasonable inferences. *Al-Naseer*, 788 N.W.2d at 474. However, a rational hypothesis must "point to evidence in the record that is consistent" with the theory and be supported by more than "mere conjecture." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008) (quotation omitted).

### *Counts 1 and 4: Firearm in the jacket in the back bedroom*

The circumstances proved are consistent with the inference that there is a "strong probability" that appellant consciously had "dominion and control" over the handgun found in the jacket in the back bedroom. *See Salyers*, 858 N.W.2d at 159 (quotation omitted). Police found appellant inside the house, and he fled in the general direction of

9

the back bedroom when they first entered.  *Cf. State v. Carr*, 311 Minn. 161, 163, 249 N.W.2d 443, 444–45 (1976) (noting that the evidence supported possession when defendant "rushed toward the area where" the contraband was located).  More significantly, there was testimony that this jacket belonged to appellant and that he had been wearing it just before the police arrived.  This evidence was further corroborated by the presence of keys inside the jacket with electronic fobs linked to appellant.  Appellant was also known to possess guns, and DNA testing linked him to this gun, albeit weakly.  Given this circumstantial evidence, there is a strong probability that appellant had dominion and control over the handgun found in the jacket.

Moreover, appellant's alternative hypotheses regarding the circumstances of this firearm are unreasonable.  His first proposed hypothesis is that he had no knowledge that this gun existed.  But, given the presence of this gun in a jacket so strongly linked to him and just a few rooms away, this hypothesis is unreasonable.  He also argues that even if he knew about the gun, another gang member, and not him, could have been exercising conscious dominion and control over the firearm when the police arrived.  While it is true that there were several people in the house, appellant had just been seen wearing the jacket and his keys were inside of it.  The location of contraband near clothing or other personal items belonging to a defendant is sufficient to establish constructive possession. *See State v. Dickey*, 827 N.W.2d 792, 797 (Minn. App. 2013) (collecting cases).  No other evidence linked the jacket or the firearm to anyone else at that time, beyond its general location.  Because appellant's alternative hypotheses are unreasonable, we

conclude that there is sufficient evidence to uphold his convictions of counts 1 and 4, relating to appellant's possession of the handgun found in the back bedroom.[1]

### Counts 2, 3, 5, and 6: Firearms in the basement and dining room

Regardless of whether it would be reasonable to infer from the circumstances proved that appellant constructively possessed the firearms found by police in the house's basement and dining room, there is at least one reasonable hypothesis *inconsistent* with appellant's guilt regarding these firearms: the firearms could have been placed there by other gang members without appellant's knowledge, direction, or acquiescence. The state claims that the evidence does not support this hypothesis, and argues that the circumstances proved show only that appellant's exercise of control over B.T.'s residence and his fellow gang members gave him the requisite possessory control over the firearms.

Constructive possession can "exist[] where an owner intentionally gives actual possession—direct physical control—of the property to another in order for that person to do some act for the owner to or with the property." *State v. Simion*, 745 N.W.2d 830, 842 (Minn. 2008). "[W]here the master surrenders physical control of the property to the servant for a use or purpose for the direct benefit of the master, the master has constructive possession while the servant has mere custody of the property." *Id.*

---

[1] Appellant also argues that the jury's decision to acquit him of the controlled substance possession charge associated with the cocaine found in the same jacket as this firearm "confirms that the inference of innocence of the gun-possession charge is at least reasonable." This argument is unpersuasive because "[t]he alleged inconsistency of the verdicts does not affect the sufficiency of the evidence to convict appellant." *State v. Thomas*, 467 N.W.2d 324, 327 (Minn. App. 1991). Juries are allowed to exercise lenity in a criminal case, and our "focus is not upon the inconsistency of the acquittals, but upon whether there is sufficient evidence to sustain the guilty verdict." *Nelson v. State*, 407 N.W.2d 729, 731 (Minn. App. 1987), *review denied* (Minn. Aug. 12, 1987).

(quotation omitted). This type of constructive possession is consistent with the doctrine of "joint" possession, which provides that "[a] person may constructively possess [contraband] alone or with others." *Denison*, 607 N.W.2d at 799; *see also State v. Lee*, 683 N.W.2d 309, 316 n.7 (Minn. 2004).

We agree with appellant's argument that the circumstances proved in this case reasonably support his hypothesis that there was no such principal-agent relationship between appellant and his fellow gang members regarding the firearms in question. The record lacks any indication that appellant gave any direction regarding, or had any interaction with, these *specific* firearms prior to the execution of the search warrant. The record, therefore, lacks the key link between principal and agent described in *Simion*— the principal's relinquishment of physical possession of the property to an agent for the agent to use at the principal's direction. *See* 745 N.W.2d at 842. While it may be reasonable to infer that the gang members procured these weapons at appellant's behest in order to further the upcoming retaliatory violence against their rival gang, the evidence is simply insufficient to obviate the reasonableness of the opposite inference: the gang members hid these guns in the house without appellant's knowledge or approval. Although appellant had been seen with a firearm and supplied guns for the gang, there was no evidence that appellant or other gang members had obtained, distributed, or hidden these *specific* firearms at the direction of appellant.

Apart from the lack of circumstances proved showing appellant's control of the gang members in relation to the firearms, the other circumstances are similarly insufficient to eliminate this hypothesis that is inconsistent with guilt. The contraband

was not found in an area over which appellant exercised exclusive dominion and control; rather, it was found in a house where appellant spent time but did not live, and in areas to which several other gang members had access at times when appellant was not present. Our caselaw on constructive possession makes clear that the defendant must exercise dominion and control over *the item itself*, not merely the area. *State v. Hunter*, 857 N.W.2d 537, 542 (Minn. App. 2014) ("[A] defendant must exercise dominion and control over the [contraband] itself in order to constructively possess it."); *see also State v. Ortega*, 770 N.W.2d 145, 150 (Minn. 2009) (noting that "mere proximity to criminal activity" is insufficient to establish probable cause for arrest for possession of contraband). Moreover, forensic testing was unable to link appellant's DNA or fingerprints to these firearms. Beyond the fact that B.T.'s house was collectively used by the gang to store firearms and appellant was found by police in the house, "no direct evidence tied appellant to possession of the contraband here." *Sam*, 859 N.W.2d at 835.

Appellant's proximity to the recovered firearms, his role in the gang, and his frequent presence at B.T.'s residence are insufficient to eliminate all reasonable hypotheses inconsistent with appellant's guilt. Therefore, we conclude that the evidence is insufficient to show a "strong probability" that appellant had "dominion and control" over the firearms associated with his convictions of counts 2, 3, 5, and 6. We reverse these convictions.

## II.

For the first time on appeal, appellant argues that the prosecutor in this case committed prosecutorial misconduct in his closing argument. Unobjected-to

13

prosecutorial misconduct is reviewed under a modified plain-error standard. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). The defendant must demonstrate error that is plain because it "contravenes case law, a rule, or a standard of conduct." *Id.* If the defendant is able to make this showing, the burden shifts to the state to demonstrate a lack of prejudice by showing "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). "If the [s]tate is unable to meet its burden, we must decide whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *State v. Vue*, 797 N.W.2d 5, 13 (Minn. 2011).

We review closing arguments in their entirety to determine whether prosecutorial misconduct occurred. *Id.* "The prosecutor has the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom." *State v. Williams*, 586 N.W.2d 123, 127 (Minn. 1998) (quotation omitted). However, "[m]isstatements of the burden of proof are highly improper and would, if demonstrated, constitute prosecutorial misconduct." *State v. Hunt*, 615 N.W.2d 294, 302 (Minn. 2000).

Appellant specifically challenges these remarks by the prosecutor:

> Now, surely when this case began [the district court] told you that the defendant was presumed innocent. This presumption need not remain forever. [The district court] read to you the instruction as it relates to the presumption of innocence and it states that it remains with the defendant unless and until the defendant has been proven guilty beyond a reasonable doubt.
> In this case[,] once [defense counsel] stood up, you were able to find that the presumption of innocence no longer

14

existed. You were able to find that the defendant lost the presumption. This is because the State has produced evidence that allows you to find the truth to overcome that presumption and to find guilt on all the counts.

Appellant argues that this is a material misstatement of the presumption of innocence because the presumption is extended until the jury renders a guilty verdict and cannot be removed before jury deliberations. We agree.

The prosecutor in this case committed plain error by arguing to the jury that it was "able to find that the defendant lost" his presumed innocence once defense counsel "stood up." We construe this statement to be a reference to defense counsel standing up to begin the defendant's case-in-chief after the state finished its presentation of evidence. However, the presumption of innocence remains until the defendant is proven guilty beyond a reasonable doubt. *See* 10 *Minnesota Practice* CRIMJIG 3.02 (2006) (providing that the presumption of innocence "remains with the defendant unless and until the defendant has been proven guilty beyond a reasonable doubt"). Here, the prosecutor told the jury that it could disregard the presumption of innocence during the course of the trial, *before* the defense presented its evidence and well before the jury began deliberations. This is incorrect. "The presumption of innocence is a fundamental component of a fair trial," and the defendant "has the right to have the jury take it to the jury room with them as the voice of the law." *State v. Peterson*, 673 N.W.2d 482, 486 (Minn. 2004) (quotation omitted); *see also United States v. Crumley*, 528 F.3d 1053, 1065 (8th Cir. 2008) (noting that the presumption of innocence "is extinguished only upon the jury's determination of guilt beyond a reasonable doubt" and that "[i]t is

15

improper [for prosecutors] to refer to the evidence as having removed the presumption" (quotation omitted)). The prosecutor's misstatement of the burden of proof also contravened the jury's duty to "[k]eep an open mind about all the evidence until the end of the trial." 10 *Minnesota Practice* CRIMJIG 1.02A (Supp. 2014); *see also* 10 *Minnesota Practice* CRIMJIG 1.02B (Supp. 2014). By misstating the presumption of innocence and directing the jury to view appellant's presentation of evidence without the required presumption in place, the prosecutor plainly erred.[2]

Because we conclude that the prosecutor's closing argument was plainly erroneous, the state bears the burden of showing a lack of prejudice. *Ramey*, 721 N.W.2d at 302. The state argues that any prejudice here was overcome by the instructions of the district court throughout trial. "[A] prosecutor's attempts to shift the burden of proof are often nonprejudicial and harmless where . . . the district court clearly and thoroughly instructed the jury regarding the burden of proof." *State v. McDonough*, 631 N.W.2d 373, 389 n.2 (Minn. 2001); *see also State v. Budreau*, 641 N.W.2d 919, 926 (Minn. 2002) ("[W]e presume that jurors follow the court's instructions."). In its opening and closing instructions, the district court stressed to the jury that the presumption of innocence remained with appellant "unless and until he has been proven guilty beyond a reasonable doubt." The prosecutor also used the correct presumption language elsewhere in his closing argument. Although we are troubled by the plain error committed by the

---

[2]  Our conclusion is further supported by the fact that, two months prior to trial in this case, we issued an unpublished opinion holding that the same prosecutor erred by making a similar misstatement of the presumption of innocence during closing arguments in another trial. *State v. Ford*, No. A13-0577, 2014 WL 1272107, at *3–4 (Minn. App. Mar. 31, 2014).

16

prosecutor in this case, it is not reasonably likely that any misconduct "would have had a significant effect on the verdict of the jury" that would warrant a reversal and new trial on this ground. *Ramey*, 721 N.W.2d at 302 (quotation omitted).

**III.**

Before opening statements, appellant's counsel raised an objection to the admission of a photograph of appellant's chest tattoo. The tattoo features two smoking revolvers across appellant's chest, with the words "Born Alone, Die Alone" above the revolvers and "1-9" between the revolvers. Over appellant's claim that the photograph had minimal probative value of his gang membership and "terribly high" potential for unfair prejudice, the district court allowed the photograph to be admitted, reasoning that:

> The reason is that i[t] does relate to the gang issue although [its] relevance isn't that high here because there is no disagreement about the membership in the gang. To me what was probably more relevant and more probative is that as people tattoo themselves, they're expressing themselves and someone tattoos themselves with guns, that certainly can be something . . . seen as indicative, the culture or attitude toward guns, doesn't mean as possess them, but certainly reflects an attitude toward them and I think that is [an] attitude that the jury is entitled to share.

The photograph of the tattoo was then admitted and published to the jury during the testimony of a police gang investigator, who testified that the "1-9," smoking revolvers, and the phrase "Born Alone, Die Alone" all signified gang membership.

Appellant argues that the district court erred by admitting this evidence because it was impermissible character evidence under Minn. R. Evid. 404(a) and unfairly prejudicial under Minn. R. Evid. 403. We review the district court's evidentiary rulings

17

for an abuse of discretion. *State v. Diggins*, 836 N.W.2d 349, 357 (Minn. 2013). "We defer to the court's evidentiary rulings because the court stands in the best position to evaluate the prejudicial nature of evidence." *Id.* (quotation omitted). If the district court has erred in admitting evidence, we then examine whether the error is prejudicial by determining whether there is a reasonable possibility that the evidence significantly affected the verdict. *State v. Post*, 512 N.W.2d 99, 102 n.2 (Minn. 1994).

Appellant does not contest that the photograph of his tattoo was relevant to ascertaining his gang membership. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. "[U]nfair prejudice is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Swinger*, 800 N.W.2d 833, 839 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. Sept. 28, 2011). One of those illegitimate means is "[e]vidence of a person's character or a trait of character" introduced "for the purpose of proving action in conformity therewith on a particular occasion." Minn. R. Evid. 404(a).

Thus, we must determine whether the district court abused its discretion in determining that the probative value of this evidence outweighed its potential for unfair prejudice. When weighing the probative value of character evidence against its prejudicial effect, "the court must consider how crucial the [character] evidence is to the state's case." *See Pierson v. State*, 637 N.W.2d 571, 581 (Minn. 2002) (quotation omitted); *see also Old Chief v. United States*, 519 U.S. 172, 184, 117 S. Ct. 644, 652

18

(1997) (noting that probative value of evidence under the federal analogue to rule 403 "may be calculated by comparing evidentiary alternatives"). The district court noted that the relevance of the photograph "isn't that high here" because there was no disagreement about appellant's membership in the gang. The record supports this determination. Appellant's counsel began the trial by admitting that his client was a member of 1-9 Block Dipset and had "been [in] a gang for a long . . . time. And guess[] what, he's got gang tattoos." Many of the trial witnesses stated that appellant was a member of 1-9 Block Dipset, and recordings of conversations between appellant and incarcerated members of the gang further corroborated this fact.

In contrast, there was a significant danger of unfair prejudice here. The photograph showed appellant, a man charged with several counts of unlawful firearm possession, as having a large chest tattoo prominently featuring two smoking revolvers. Part of the district court's rationale for admitting this photograph was the "more probative" fact that a tattoo with guns indicates a person's "culture or attitude toward guns," which was an attitude "that the jury is entitled to share." However, to the extent that the evidence showed that appellant "is a person who possesses firearms," the jury was *not* entitled to share this attitude. Such evidence "invite[d] the inference" by the jury that appellant had the propensity to own guns and therefore possessed the firearms in this case. *State v. Smith*, 749 N.W.2d 88, 93 (Minn. App. 2008) (holding inadmissible a photograph of a defendant near a table with guns which "associate[d] [the defendant] with firearms and [did] so with a nefarious connotation"). This is exactly the kind of

prejudicial character evidence the rules of evidence are meant to exclude. We conclude that the district court abused its discretion in admitting the photograph.

But, appellant has not met his burden of showing that this evidence "substantially influence[d] the jury's decision." *State v. Nunn*, 561 N.W.2d 902, 907 (Minn. 1997). If there is a reasonable probability that the verdict might have been more favorable to the defendant without the admission of the evidence, then the error is prejudicial. *Post*, 512 N.W.2d at 102 n.2. In evaluating prejudice, we are to consider "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether the defense effectively countered it." *Townsend v. State*, 646 N.W.2d 218, 223 (Minn. 2002). Although there was substantial evidence supporting the firearm possession charges against appellant relative to the firearm found in his jacket, the tattoo photograph was by no means the linchpin of the state's case. It did not come into evidence until the state's final witness was testifying, was briefly referred to by that witness, and only defense counsel, not the state, referenced the tattoo during closing arguments. Given the lack of prejudice, we conclude that the district court's error in admitting the tattoo photograph does not require reversal of appellant's convictions.

**IV.**

Appellant further argues that the district court erroneously instructed the jury as to the proper definition of constructive possession. A district court has broad discretion in giving jury instructions. *State v. Kelley*, 855 N.W.2d 269, 274 (Minn. 2014). "But a district court abuses that discretion if its jury instructions confuse, mislead, or materially misstate the law. We review the jury instructions as a whole to determine whether the

instructions accurately state the law in a manner that can be understood by the jury." *Id.* (citation omitted). Because appellant did not object at trial to the jury instruction, we review this claim for plain error affecting substantial rights. *State v. Manley*, 664 N.W.2d 275, 283 (Minn. 2003). The three-pronged test for plain error requires appellant to show that: (1) the district court committed error; (2) the error committed was plain; and (3) the plain error affected his substantial rights. *Id.*

The district court instructed the jury regarding constructive possession as follows:

> Possession, it is not necessary that possession occur for any particular amount of time. A person possessing a firearm is if it [is] on his person. A person also possesses a firearm if [it] was in a place under his exclusive control to which other people [did] not normally have access or found in a place to which others had access [and] he knowingly exercised dominion and control over it.
> The law recognizes two kinds of possession, actual possession and constructive possession. A person who knowingly has directive of a control [sic] over a thing is then [in] actual possession of it. *A person who is not in actual possession of a thing that has knowingly . . . got the power and the intention to exercise authority and control over it, either directly or through another person, is then in constructive possession of it.*

(Emphasis added.) Appellant acknowledges that the first paragraph of this instruction accurately quotes the definition of constructive possession provided by the supreme court and used in current pattern jury instructions. *See Florine*, 303 Minn. at 105, 226 N.W.2d at 611 (holding that constructive possession is shown "if police found [contraband] in a place to which others had access [and] there is a strong probability . . . that defendant was at the time consciously exercising dominion and control over it"); *see also* 10 *Minnesota*

21

*Practice* CRIMJIG 32.42 (Supp. 2014). He instead takes issue with the second paragraph of the instruction, arguing that it materially misstates the *Florine* standard.

These arguments are unavailing. Appellant asserts that this instruction allowed the jury to find constructive possession based on appellant's "future" intention to exercise control. He stresses the word "intention" in the instruction, but the instruction required the jury to find that appellant had "*the power and* the intention to exercise authority and control" over the guns. (Emphasis added.) This language is substantially similar to the "conscious[] exercise[] [of] dominion and control" found in *Florine*. *See* 303 Minn. at 105, 226 N.W.2d at 611. Any concern that the jury could find appellant guilty for "future" intent was allayed by the district court's instruction to the jury that the criminal acts must have taken place between December 1 and December 12, 2013.

He next argues that the district court incorrectly expanded the doctrine to cover constructive possession "through another person." But, appellant's own citation to caselaw indicates that constructive possession "exists where an owner intentionally gives actual possession . . . of the property to another." *Simion*, 745 N.W.2d at 842. As discussed *supra*,[3] a defendant may constructively possess contraband "through another person" if the facts sufficiently establish the defendant's continued dominion and control over an item after relinquishing it to another. *See id.*

Finally, appellant argues that the instruction failed to require proof that appellant "once actually possessed the contraband." Although *Florine* does indicate that the

---

[3] We further note that, even if we held that the district court's jury instruction here was plainly erroneous, any resulting prejudice is obviated by our reversal of appellant's convictions relating to the firearms found in the house's basement and dining room.

22

"purpose" of this doctrine was to allow the definition of "possession" in the statute to include "those cases . . . where the inference is strong that the defendant at one time physically possessed the [contraband]" and then maintained that possessory interest through dominion and control, its holding does not require proof that the defendant had physically possessed the item in the past. *See* 303 Minn. at 104–05, 226 N.W.2d at 610–11. Accordingly, we conclude that the district court did not materially misstate the law in its jury instruction regarding constructive possession.

## V.

Appellant argues that the prosecution violated criminal discovery rules and that we should therefore reverse and remand for a new trial. Prior to trial, appellant moved the district court for dismissal of the charges or suppression of evidence in relation to the prosecution's delay in providing the defense with a transcribed statement B.T. gave to the state. B.T.'s statement appears to have been made on April 11, 2014, but was not disclosed by prosecutors to appellant until May 2, four days before trial began and three weeks after the statement was taken. The prosecutor had informed appellant's counsel on April 28 that a witness from the residence would be testifying, but did not indicate what the substance of the testimony would be. Appellant's counsel indicated that he sought dismissal of the case or suppression of this testimony because the delayed disclosure was a "significant disadvantage to prepar[ing] [an] adequate defense" for appellant. Appellant did not seek a continuance because he had demanded a speedy trial.

In response, the prosecutor and district court indicated that the state had withheld the statement from disclosure because: (1) B.T.'s testimony at appellant's trial hinged on

the resolution of child endangerment charges which had been brought against her, and a plea agreement involving her trial testimony was not reached until April 28; and (2) "[t]here were some issues relating to . . . witness safety." The district court was also handling B.T.'s criminal case, and the prosecutor indicated that he had proceeded at the direction of the district court in delaying disclosure of the witness statement until May 2. The district court confirmed this, indicating that it had told the prosecutor on April 28 to inform appellant's counsel "of the substance of the revelation that [B.T.] was going to be testifying [to]" and then provide appellant with a copy of the transcript by May 2. The district court ultimately denied appellant's motion for dismissal or preclusion of B.T.'s testimony, but indicated that it would grant a continuance if needed.

Appellant argues that the district court failed to properly remedy the violation by precluding B.T.'s testimony, and he asserts that a new trial is therefore required. "The imposition of sanctions for violations of discovery rules and orders is a matter particularly suited to the judgment and discretion of the [district] court. . . . Accordingly, we will not overturn its ruling absent a clear abuse of discretion." *State v. Patterson*, 587 N.W.2d 45, 50 (Minn. 1998) (quotation omitted). Even assuming that the prosecutor's conduct here was a violation of the discovery rules, we conclude that the district court did not abuse its discretion in deciding that a continuance was the appropriate remedy. There is no indication that the prosecutor withheld the statement in bad faith, and appellant was informed that the state would be calling a witness who was at B.T.'s residence. The district court gave appellant the option of a continuance if he needed more time to prepare for trial, and, before B.T. testified at trial, the district court indicated that it would

24

allow the defense to recall B.T. if there were additional areas of inquiry that arose after other state witnesses concluded their testimony. Given the willingness of the district court to accommodate any prejudice that resulted from the prosecutor's late disclosure, we conclude that the district court did not abuse its discretion in declining to preclude B.T. from testifying in connection with the state's delayed witness-statement disclosure.

## VI.

Appellant argues that his conviction of being a prohibited person in possession of a firearm (count 4) is a lesser-included offense of his conviction of being a prohibited person in possession of a firearm for the benefit of a gang (count 1), and thus should not have been adjudicated. A defendant cannot be convicted of both a charged crime and an included offense if the included offense is "[a] crime necessarily proved if the crime charged were proved." Minn. Stat. § 609.04, subd. 1(4) (2012). As conceded by the state, it is clear that appellant's firearm-possession conviction was a lesser-included offense. "In a crime committed for the benefit of a gang, the underlying crime is an included crime." *State v. Lopez-Rios*, 669 N.W.2d 603, 615 (Minn. 2003). The district court correctly recognized this fact, at both the sentencing hearing and in a written sentencing order, by indicating that counts 4–6 "merged" into counts 1–3. However, the warrant of commitment formally adjudicated appellant guilty of all six counts, including counts 4–6. A written judgment of conviction provides "conclusive evidence of whether an offense has been formally adjudicated." *Spann v. State*, 740 N.W.2d 570, 573 (Minn. 2007) (quotation omitted). Because appellant's lesser-included offense "should not be formally adjudicated at this time," *id.* (quotation omitted), we remand for the district

25

court to vacate appellant's conviction on count 4, being a prohibited person in possession of a firearm, regarding the firearm found in the jacket in the back bedroom.[4]

Because the evidence is insufficient to support appellant's convictions on counts 2, 3, 5, and 6, we reverse those convictions. We also remand for the district court to vacate appellant's conviction on count 4 because it is a lesser-included offense. Although we conclude that the admission into evidence of the photograph of appellant's tattoo and the prosecutor's misstatement of the presumption of innocence were erroneous, appellant was not prejudiced by these errors. Accordingly, we affirm appellant's conviction of count 1, being a prohibited person in possession of a firearm for the benefit of a gang, and remand for resentencing on this remaining conviction.

**Affirmed in part, reversed in part, and remanded.**

---

[4] Our reversal of counts 2, 3, 5, and 6 render appellant's remaining sentencing arguments moot.