STATE OF MINNESOTA

IN SUPREME COURT

A24-0532

Hennepin County                                                    Gaïtas, J.

State of Minnesota,

        Respondent,

vs.                                                                Filed: July 30, 2025
                                                                   Office of Appellate Courts
James Nyonteh,

        Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Nicole Cornale, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Chang Y. Lau, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court did not abuse its discretion when it excused a seated juror for falling asleep during trial.

2.      The State's circumstantial evidence proved beyond a reasonable doubt that appellant committed the offense of first-degree criminal sexual conduct.

1

3.     In addition to appellant's conviction for first-degree premeditated murder, the warrant of commitment erroneously includes convictions for first-degree domestic abuse murder and second-degree intentional murder committed against the same victim.

4.     Appellant's claims in his pro se supplemental brief do not merit relief.

Affirmed in part, reversed in part, and remanded.

O P I N I O N

GAÏTAS, Justice.

A jury found appellant James Nyonteh guilty of first-degree premeditated murder, first-degree domestic abuse murder, and second-degree intentional murder for killing his wife, and first-degree criminal sexual conduct for sexually abusing his minor stepdaughter. The district court sentenced Nyonteh to life imprisonment without the possibility of release and a consecutive prison term of 144 months. Nyonteh directly appeals his convictions, arguing that the district court erred by dismissing a juror for sleeping at trial over Nyonteh's objection; that respondent State of Minnesota failed to prove beyond a reasonable doubt that the stepdaughter feared imminent great bodily harm during the sexual assaults; and that the district court erred by entering convictions for first-degree domestic abuse murder and second-degree intentional murder, in addition to a conviction for first-degree premeditated murder. In a pro se supplemental brief, Nyonteh argues that he was denied his right to self-representation and that his trial counsel provided ineffective assistance. Because the district court did not err in dismissing the sleeping juror, the evidence was sufficient to support Nyonteh's first-degree criminal sexual conduct conviction, and Nyonteh's pro se claims lack merit, we affirm in part. But because the warrant of

2

commitment erroneously includes convictions for first-degree domestic abuse murder and second-degree intentional murder, we reverse in part and remand to the district court to vacate those convictions.

## FACTS

P.Y.—a mother of three children—and Nyonteh married in 2021 after being in a relationship for a few years. They lived together, along with P.Y.'s children.

In March 2022, P.Y. called Champlin police to report that Nyonteh had been molesting her 16-year-old daughter, S.Y. Police interviewed S.Y., who confirmed that Nyonteh had sexually abused her on an ongoing basis.

Following the report of sexual abuse, Nyonteh packed his belongings and left the family home. P.Y. and the children moved to the home of P.Y.'s brother. Less than three weeks after the sexual abuse report, Nyonteh went to P.Y.'s brother's house. Nyonteh confronted P.Y. in the front yard as she arrived home from work and killed her using a hatchet and a knife.

A grand jury indicted Nyonteh for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2020); first-degree domestic abuse murder, Minn. Stat. § 609.185(a)(6) (2020); second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2020); and first-degree criminal sexual conduct–fear of imminent great bodily harm, Minn. Stat. § 609.342, subd. 1a(a) (Supp. 2021).[1] Nyonteh, who was represented by counsel, had a jury trial.

---

[1] We cite to the statutes that were in effect at the time of the offenses.

### Sexual abuse of S.Y.

At trial, S.Y. testified that Nyonteh began molesting her when she was 14 years old. She explained that the first time it happened, she awoke to Nyonteh kneeling at the end of her bed with his fingers "in [her] private part." The following day, Nyonteh told her that he had joined a cult and that "in order for him to survive, . . . he had to have sex with somebody who is still a virgin." Nyonteh told S.Y. that the cult members were threatening him and that they would kill P.Y. or S.Y.'s siblings if S.Y. did not "do it."

S.Y. testified that Nyonteh first penetrated her vagina with his penis when she was 14 years old. Over the next few years, Nyonteh sexually penetrated S.Y. numerous times in multiple locations, including the living room of their shared home, S.Y.'s bedroom, P.Y.'s bedroom, Nyonteh's friend's basement, and the bathroom in a relative's house in Champlin where S.Y. stayed for some time.

S.Y. testified that each time she denied Nyonteh's sexual advances, she would receive threatening text messages from unknown phone numbers. She told the jury that "[o]ver the course of two years," she received these anonymous messages "[p]robably mostly every day," sometimes more than once per day. The text messages threatened that if S.Y. did not follow the instructions provided or submit to Nyonteh's advances, S.Y., her mother, her biological father, and her siblings would be hurt or killed. Once, S.Y. told Nyonteh that she planned to report the sexual abuse to her mother. S.Y. then received a text message stating that both S.Y. and P.Y. would die. On another occasion, S.Y. responded to a text from an unknown number, stating that she would no longer have sex with Nyonteh. Following this response, S.Y. received another message from the unknown

4

number, which threatened to hurt S.Y.'s biological father and included a photo of him. Sometimes the messages included photos of S.Y.'s other family members, the inside of her home and bedroom, and cars used by her family members. S.Y. testified that these messages made her feel "really scared" and "like [she] was just getting controlled." The messages led her to believe that the individuals who were threatening her were nearby.

S.Y. awakened one night to discover an apparent burglary of the family's home. The front door had been left open and the family's belongings were strewn about. It was later determined that Nyonteh had staged the burglary. Soon after this incident, which S.Y. believed to be a burglary, S.Y. received a text message from an unknown number stating that she either needed to have sex with Nyonteh to settle her "account" with the cult, or she would "have to do everything no matter what."

S.Y. testified that, soon after, she disclosed the abuse to her mother, who then reported it to police. She explained during the trial that, although she had acknowledged the sexual abuse when she initially spoke with the police, she did not reveal the full extent of it then because she feared for her safety and the safety of her family due to the persistent threats.

During a subsequent forensic interview, the interviewer observed that S.Y. appeared afraid, especially when sharing the messages she had received on her phone from unknown numbers. S.Y. also underwent a sexual abuse examination. During the examination, S.Y. shared that her stepfather had raped her and that afterward she had experienced pain. An internal examination showed that S.Y. had a "deep hymenal cleft," which was consistent with penetrative trauma.

5

A later examination of Nyonteh's phone confirmed that the phone had been used to send S.Y. messages and photos. Nyonteh had installed an application that allowed the phone to send messages from different anonymous phone numbers.

Three weeks after P.Y. first reported the sexual abuse to the police, Nyonteh went to S.Y.'s after-school job. When S.Y. went outside to empty the trash, she saw Nyonteh get out of a white car. He approached S.Y., gave her a mailbox key, and asked how she was doing. S.Y. said that she was "good" or "fine" and went back inside to her job. When S.Y. finished her shift, the white car Nyonteh had gotten out of followed her on the freeway. She called P.Y., extremely upset. P.Y. directed S.Y. to go directly to P.Y.'s brother's house, and then P.Y. called the police. When S.Y. arrived at P.Y.'s brother's house, S.Y. was "shaking" and "crying."

### P.Y.'s Death

Several hours after S.Y.'s encounter with Nyonteh, P.Y. finished work and went home to her brother's house. During the commute home, P.Y. was on the phone with her friend, T.J. P.Y. parked outside her brother's house and closed her car door. According to her friend, P.Y. then began screaming. P.Y. told her friend, "It's [Nyonteh]. He have [sic] a knife. Call 911." Her friend heard P.Y. telling Nyonteh, "You need to stop," and Nyonteh responding, "I just want to talk." Her friend testified that she heard P.Y. say, "No you don't want to talk. You have a knife." Her friend hung up, and she immediately called N.T., the wife of P.Y.'s brother, who was inside the house. She instructed the brother's wife to go outside because Nyonteh was chasing P.Y. with a knife. The friend then called 911.

When the brother's wife and S.Y. went outside, they discovered P.Y., who was cut and bloodied and lifeless, on the ground. Nyonteh was not present. Police and paramedics arrived, and P.Y. was ultimately pronounced dead.

Several hours later, Nyonteh was arrested in Fargo, North Dakota. He admitted to police that he had stabbed P.Y. and struck her with a hatchet. Substantial physical evidence confirmed Nyonteh's confession. That evidence included a blood-like substance in several places on the interior and exterior of Nyonteh's car, blood matching P.Y.'s DNA profile on both a knife and a hatchet found in the car, Nyonteh's fingerprints on the knife, and a receipt in Nyonteh's wallet for the purchase of the knife and the hatchet just eight days before P.Y.'s death.[2]

### *The District Court's Dismissal of Juror 18*

Six days into Nyonteh's jury trial, and over Nyonteh's objection, the district court excused a seated juror. The juror—Juror 18—had twice arrived late. Even more concerning to the district court, Juror 18 had slept through some of the trial testimony on multiple days.

On the second day of the trial, Juror 18 arrived more than 90 minutes late, delaying the start of the proceedings. Subsequently, Juror 18 fell asleep three times during the testimony of the police officer who took the initial report regarding Nyonteh's sexual abuse of S.Y. and the testimony of S.Y.'s forensic interviewer. During the forensic interviewer's testimony, the district court called for a "five-minute stretch break." The district court then

---

[2] The State also presented evidence of Nyonteh's past physical and sexual abuse of two other individuals, which is not relevant to the issues presented here.

made a record of its observations. The district court stated that Juror 18 "ha[d] fallen asleep three times during the testimony [that] morning"—between 9:30 and 10:30 a.m. Initially, the district court had been able to rouse Juror 18 by coughing loudly. But, according to the district court, Juror 18 fell asleep two more times. The district court noted that it had called Juror 18 to the bench to check in. During the conversation at the bench, Juror 18 explained that he had been late due to traffic, and he was not typically awake during the time when the court held its morning session. The district court impressed upon Juror 18 the importance of arriving on time going forward.

Based on this record made by the district court, the prosecutor moved to dismiss Juror 18. The prosecutor argued that Juror 18's sleeping amounted to a failure of the juror to fulfill his obligations. Nyonteh's counsel objected, contending that the motion was premature and noting that Juror 18 was the only Black juror on the panel. The district court denied the prosecutor's motion but warned that dismissal might be warranted if the juror continued to sleep during the trial. Before resuming the testimony, the district court's clerk provided Juror 18 a cup of coffee.

The next day, Juror 18 arrived in court between 20 and 30 minutes late.

On the fifth day of trial, Juror 18 again slept during the testimony of two prosecution witnesses—the pediatric nurse practitioner who examined S.Y. and a crime scene investigator who processed Nyonteh's car after P.Y.'s death. Minutes into the investigator's testimony, the district court called for another "five-minute stretch break" and sent the jury out into the hallway. Juror 18 was again provided a cup of coffee. The

8

district court later explained for the record that it had ordered the stretch break because Juror 18 had fallen asleep during the proceedings.

The prosecutor renewed the motion to excuse Juror 18, highlighting that Juror 18 had slept through the testimony of at least three witnesses on different days and that there were seventeen more witnesses to be called. Nyonteh's counsel again opposed the motion, arguing that it was premature, that Juror 18 had not slept through all of the testimony, and that the district court had been diligent about handling the situation. The district court denied the prosecutor's motion but expressed growing concern about the impact of Juror 18's sleeping during the proceedings.

On the sixth day of trial, Juror 18 slept during testimony again. The State moved for a third time to excuse Juror 18. The prosecutor noted that the trial was "voluminous" and "complex," with more than 300 exhibits and numerous expert witnesses. Nyonteh's counsel objected and suggested that the district court have a formal hearing regarding the prosecutor's motion.

After the lunch break, the district court allowed the parties to present legal arguments regarding the district court's options for addressing Juror 18's sleeping. The district court took the prosecutor's motion to excuse Juror 18 under advisement.

At the end of the day, and after allowing the parties to present additional arguments, the district court granted the State's motion to excuse Juror 18. The district court stated:

> It is difficult for me to dismiss a juror over the defense's objection, but I do think—I know expressed earlier was the idea that the defendant is really the one who is entitled to this, to the full and fair attention of all the jurors and that if he's not going raise it, then I shouldn't act on it. I do think the defendant is entitled to the full and fair attention of all the jurors. I have

9

no quarrel with that. I just don't think that that constitutes veto power over excusing a juror that just isn't giving their full and fair attention to the trial.

I think that it is my job to ensure a—you know, justice and fairness for both sides of this case and, frankly, more importantly, the integrity of the system, that there are—that the jurors that go into deliberations are jurors who have made—well, I mean I think counsel is right. Nobody's going to remember all the evidence in this case, and there's a good reason that we have 12 jurors and that we memorialize evidence in the form of exhibits and the like and we allow jurors to ask questions, all of which I think is an implicit recognition that no juror will ever hold all of this in their head. And I think I noticed earlier that I'm something close to 70 pages of notes in my—and I've got one of the oversized notebooks that I take notes in. So I don't expect that everyone would memorize that.

But I do expect that, you know, in that notion of full and fair attention that we expect of jurors, and that's just not happening with this juror. And as a consequence, I'm going to grant the State's motion to excuse him, which means we will have one alternate. I am—I have put this off three times, and I think I've hit the point now where they're just not capable—I'm making the factual determination that they're just not capable of administering . . . their full and fair attention during this trial.

An alternate juror replaced Juror 18.

### *Nyonteh's Testimony*

Nyonteh testified on his own behalf. He denied sexually assaulting S.Y., and he denied intentionally killing P.Y.

### *The Verdicts and Sentencing*

The jury found Nyonteh guilty of all charges.[3] On the record, the district court entered convictions for first-degree premeditated murder and first-degree criminal sexual

---

[3] Nyonteh filed several post-verdict motions, including a motion for a new trial due to "irregularity in the proceedings and juror misconduct." *See* Minn. R. Crim. P. 26.04, subd. 1 (providing a list of bases on which the district court may "grant a new trial," including "[i]rregularity in the proceedings, or any order or abuse of discretion that deprived the defendant of a fair trial" and "jury misconduct"). The district court denied the motion.

10

conduct. The district court's warrant of commitment, however, also includes convictions for first-degree domestic abuse murder and second-degree intentional murder. The district court sentenced Nyonteh to life imprisonment without the possibility of release for first-degree premeditated murder and to a consecutive prison term of 144 months for first-degree criminal sexual conduct.

Nyonteh directly appeals his convictions.

**ANALYSIS**

**I.**

Nyonteh first argues that the district court abused its discretion by excusing Juror 18 over Nyonteh's objection. He notes that, in *State v. Hallmark*, we equated a claim that a sleeping juror prejudiced the trial outcome to a juror misconduct claim. *See* 927 N.W.2d 281, 301 (Minn. 2019) (reviewing the appellant's pro se argument that he was prejudiced by a sleeping juror as a juror misconduct claim, which requires a party to show actual misconduct and prejudice from the misconduct). Nyonteh contends that the district court abused its discretion by failing to hold an evidentiary hearing on the question of whether Juror 18's sleeping constituted misconduct. He further argues that the district court abused its discretion by excusing Juror 18 without considering whether the juror committed misconduct that resulted in prejudice.[4] Nyonteh asks us to conclude that the removal of Juror 18 amounted to a structural error that requires a new trial. Alternatively, Nyonteh

---

[4] Although Nyonteh suggests that the district court's decision implicated his constitutional rights—his right "to a chosen jury" and to be tried "by a particular tribunal"—he does not argue that he had a constitutional right to have Juror 18 serve on his jury.

11

seeks a remand to the district court for an evidentiary hearing on the issues of whether Juror 18 committed misconduct and whether the misconduct caused prejudice.

The State argues that we should not apply our law governing claims of juror misconduct to the circumstances here, where the district court excused the juror for repeatedly sleeping during trial testimony. It points out that we previously have reviewed a district court's decision to remove a seated juror for an abuse of discretion, affording the district court wide latitude in making this decision. *E.g.*, *State v. Manley*, 664 N.W.2d 275, 284–85 (Minn. 2003). The State urges us to apply this same standard in reviewing a district court's decision to remove a sleeping juror, and not to treat such claims as juror misconduct claims. According to the State, the district court's decision to remove Juror 18 was a proper exercise of discretion and does not require reversal of Nyonteh's convictions.

To decide these issues, we initially review our case law and procedural rules to determine what law should govern a district court's decision to remove a seated juror. Then, in light of the applicable law, we consider the particular facts of this case.

A.

We have addressed a district court's decision to remove a seated juror on one other occasion. In *Manley*, which involved a criminal trial, a juror stated during jury selection that her sister worked in the jurisdiction as a public defender. 664 N.W.2d at 283. When questioned about the impact of her relationship with her sister on her impartiality, the juror responded that she "did not feel that her sister's position would influence her during the trial." *Id.* Ultimately, the juror was seated. *Id.* During the ensuing trial, the district court noticed that the juror's sister "was frequently present in the courtroom observing the trial."

12

*Id.* at 283–84. The district court grew concerned about the presence of the sister in the courtroom and, specifically, whether it was influencing the juror. *Id.* at 284. Given the concern, the district court questioned the juror's sister about any conversations she had with the juror about the case. *Id.* The sister told the district court that she had asked the juror for the defendant's name, and when the juror explained that she could not discuss the case, the sister assured her that she could disclose "the defendant's name, the charges, the judge, and the attorneys." *Id.* at 284 n.4. After a weekend recess, the State noted its concern about the juror's ability to be impartial. *Id.* at 284. The district court questioned the juror, and the juror revealed that her sister had been driving her to and from court during the trial. *Id.* But the juror stated that her sister's presence had not influenced her. *Id.* The district court did not remove the juror. *Id.* However, the following day, the juror asked to be excused. *Id.* She told the district court that her "association with [her] sister" could impact her objectivity. *Id.* The district court then excused the juror and seated an alternate juror. *Id.*

On appeal to this court, Manley argued that the district court erred by questioning the juror and by eventually excusing her. *Id.* We observed that a district court's decision to excuse a seated juror was "somewhat analogous" to "the question [that] arises [during jury selection] as to whether a prospective juror should be removed for cause." *Id.* In those situations, we noted, "we give great deference to the [district] court in making its determination." *Id.* We stated that a district court is responsible for ensuring that trial proceedings are fair, and that when there are concerns about the fairness of the proceedings, "it is appropriate for the [district] court to address those concerns." *Id.* And we concluded

13

that there was no reason to treat a district court's decision to remove a seated juror any differently from the decision to remove a prospective juror for cause during jury selection. *See id.* at 284–85. We then rejected Manley's argument that the district court erred in removing the juror from his jury panel, determining that the district court did not abuse its discretion when it questioned the sister and the juror, and when it excused the juror. *Id.*

Nyonteh argues that our decision in *Manley* should not apply when the juror's conduct is sleeping. Instead, he asks us to apply our case law governing juror misconduct to sleeping juror claims. *See State v. Pederson*, 614 N.W.2d 724, 730 (Minn. 2000) (outlining a framework for analyzing claims of juror misconduct, including requiring an evidentiary hearing when a claimant shows a prima facie case of juror misconduct and imposing a burden on the claimant to demonstrate that actual misconduct occurred and that the misconduct caused prejudice); *see also Schwartz v. Minneapolis Suburban Bus Co.*, 104 N.W.2d 301, 303 (Minn. 1960) (observing that the "better practice" in cases involving alleged juror misconduct is for the district court to hold an evidentiary hearing). Nyonteh correctly notes that, in *Hallmark*, we cited juror misconduct cases when considering Hallmark's pro se claim that he was "prejudiced" because one of his alternate jurors fell asleep during trial. 927 N.W.2d at 301.

However, our decision in *Hallmark* did not expressly adopt a juror misconduct framework for cases involving sleeping jurors. Without detailed analysis, we stated in *Hallmark* that to "succeed on a claim of juror misconduct, Hallmark must show 'actual misconduct' by a specific juror and prejudice resulting from the misconduct." 927 N.W.2d at 301 (citation omitted). We then cited *State v. Peterson*, which holds that a party claiming

14

juror misconduct bears "the burden of demonstrating actual misconduct and prejudice." 262 N.W.2d 706, 707 (Minn. 1978). And we cited *State v. Danielson*, which involved an alleged sleeping juror. 150 N.W.2d 567, 568 (Minn. 1967). But *Danielson* did not hold that a juror commits misconduct by sleeping. The entirety of our analysis in *Danielson* regarding the allegation that a juror had fallen asleep was as follows:

> With respect to the second claim of defendant, all that happened was that near the beginning of the trial the court asked one of the jurors whether he was paying attention or was, possibly, asleep; the juror answered that he was simply bowing his head. There is no further indication that he was actually sleeping. There is no showing of prejudice. This claim requires no further comment.

*Id.* Although our discussion in *Hallmark* may have been imprecise, we reject Nyonteh's argument that *Hallmark* requires a district court to apply our juror misconduct law in deciding whether to excuse a sleeping juror.[5]

We hold that falling asleep is not juror misconduct. Instead, it is conduct that may impact or bear on a juror's ability to serve fairly. In deciding whether to excuse a seated juror during trial for sleeping—or for another reason related to the juror's ability to fairly serve—a district court must exercise its discretion. In exercising that discretion, a district court should consider our procedural rule that requires jurors to be "[a]ble to render satisfactory jury service." Minn. Gen. R. Prac. 808(b)(5). A district court should also be

---

[5]     Nothing in this decision should be construed as changing our determination that Hallmark was entitled to no relief on his claim that he was prejudiced by the alleged sleeping of an alternate juror who did not participate in deliberations. Because the juror in *Hallmark* did not deliberate, Hallmark could not have been prejudiced. *Hallmark*, 927 N.W.2d at 301.

15

mindful in criminal cases that, "[i]f a juror becomes unable to serve, an alternate juror must replace that juror." Minn. R. Crim. P. 26.02, subd. 9. Most importantly, we emphasize that a district court must ensure that every trial is fair. *Manley*, 664 N.W.2d at 284. When concerns arise about the ability of a seated juror to render satisfactory jury service, and those concerns implicate the fairness of a trial, it is appropriate for the district court to exercise its discretion to address those concerns.[6] *See id.*

With these principles in mind, we examine the facts presented in this case.

B.

Because Juror 18 did not commit juror misconduct by falling asleep, the district court was not required to apply our juror misconduct law in considering the State's motion

---

[6] On the other hand, in cases involving allegations of juror misconduct, district courts must continue to follow our separate line of cases concerning juror misconduct. *See Pederson*, 614 N.W.2d at 730–31. Our review of Minnesota case law reveals that juror misconduct is uncommon. We have previously determined that a juror's intentional alcohol intoxication to "an extent as to impair his faculties, and render him incapable of comprehending or appreciating the proceedings in court, or unfit him for an intelligent, fair, and impartial consideration of the case" may constitute juror misconduct. *State v. Salverson*, 91 N.W. 1, 3–4 (Minn. 1902). In *Schwartz*, we stated that "[c]ases may and do arise where a juror's untruthful answering of questions propounded upon a voir dire examination will prevent a litigant from having a fair trial." 104 N.W.2d at 303. Additionally, Rule 606(b) of the Minnesota Rules of Evidence identifies the limited circumstances when a juror's statement regarding "the verdict or indictment" will be admissible at any hearing concerning juror misconduct:

> [A] juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror, or as to any threats of violence or violent acts brought to bear on jurors, from whatever source, to reach a verdict . . . .

Minn. R. Evid. 606(b).

to excuse Juror 18. We therefore reject Nyonteh's argument that the district court erred when it did not hold an evidentiary hearing to determine whether Juror 18's conduct was actual misconduct that caused prejudice.

Because Juror 18's sleeping raised a concern about Juror 18's ability to render satisfactory jury service, which implicated the fairness of Nyonteh's trial, the district court had discretion to address the concern in an appropriate manner. We review a district court's decision to excuse a seated juror to ensure the fairness of a trial for an abuse of discretion. *Manley*, 664 N.W.2d at 285. "A court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Glover*, 4 N.W.3d 124, 134 (Minn. 2024) (citation omitted) (internal quotation marks omitted).

We discern no abuse of discretion. The record shows that Juror 18 slept multiple times during trial testimony on at least four trial days, including testimony by the police officer who responded to the initial report of S.Y.'s sexual abuse, the forensic interviewer who interviewed S.Y., the pediatric nurse practitioner who examined S.Y., and the crime scene investigator who processed Nyonteh's car following the killing of P.Y. The district court made diligent efforts to keep Juror 18 awake and engaged, including coughing loudly, bringing Juror 18 to the bench to encourage him to stay awake, repeatedly calling for mid-trial stretch breaks, and offering Juror 18 coffee. Additionally, the district court explored the reasons for Juror 18's inability to stay awake for testimony. The district court stated, "I had no impression that it . . . [was Juror 18's] intention to ignore the trial," noting that Juror 18 was "quite apologetic." Further, the district court remarked,

17

> [Juror 18] admitted to me that he's just not the kind of guy that's usually awake in the morning, and I think the other time he told me that he had been working at Walmart until 11:00 the night before. I assume he didn't get to bed before midnight on that occasion.

Throughout the trial, the district court reiterated its concern about the impact of Juror 18's sleeping on the fairness of the proceedings. Ultimately, in the district court's judgment, Juror 18's sleeping created an intolerable risk of unfairness to both the State and Nyonteh. At that point, the district court excused Juror 18 and seated an alternate.

The district court made an extensive record of its concerns. It tried to change Juror 18's behavior. It weighed the benefits and harms of excusing Juror 18 multiple times. And it ultimately made a well-reasoned decision to excuse the juror in the interest of a fair trial. We conclude that the district court's decision to remove Juror 18 for sleeping was an appropriate exercise of its discretion that does not warrant reversal of Nyonteh's convictions.

## II.

Nyonteh next challenges the sufficiency of the evidence underlying his conviction for first-degree criminal sexual conduct. He argues that the State's evidence failed to prove beyond a reasonable doubt one element of the offense—that S.Y. reasonably feared imminent great bodily harm during the sexual penetration. *See* Minn. Stat. § 609.342, subd. 1a(a). The State responds that it presented ample evidence from which the jury could conclude that it had satisfied its burden to prove this element.

"In a criminal proceeding, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the State must prove every element of the

18

offense beyond a reasonable doubt." *State v. Culver*, 941 N.W.2d 134, 142 (Minn. 2020).

To convict Nyonteh of first-degree criminal sexual conduct, the State was required to prove, among other elements, that the "circumstances existing at the time of the act"—sexual penetration—"cause[d] [S.Y.] to have a reasonable fear of imminent great bodily harm to [herself] or another." Minn. Stat. § 609.342, subd. 1a(a).

When considering a challenge to the sufficiency of the evidence, we must "view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any evidence that conflicts with the verdict." *Culver*, 941 N.W.2d at 142 (citation omitted) (internal quotation marks omitted). The applicable standard of review depends on whether the conviction—or, as in this case, the specific element at issue—is supported by direct evidence or circumstantial evidence. *State v. Segura*, 2 N.W.3d 142, 155 (Minn. 2024). "[D]irect evidence is [e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (second alteration in original) (citation omitted) (internal quotation marks omitted). Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *Id.* (citation omitted) (internal quotation marks omitted). It "always requires an inferential step to prove a fact that is not required with direct evidence." *Id.* Both parties agree that the evidence of the element at issue—reasonable fear of imminent great bodily harm—was circumstantial.

"Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473

19

(Minn. 2010) (citation omitted) (internal quotation marks omitted). When an element is supported by circumstantial evidence, we apply a heightened, two-step standard of review. *Segura*, 2 N.W.3d at 155. First, we "identify the circumstances proved" by "winnow[ing] down the evidence presented at trial to a subset of facts that are consistent with the jury's verdict." *Id.* (citation omitted) (internal quotation marks omitted). We must "disregard all evidence that is inconsistent with the verdict." *Id.* Second, we "identify the reasonable inferences that can be drawn from the circumstances proved when viewed as a whole and not as discrete and isolated facts." *Id.* (citations omitted) (internal quotation marks omitted). In step two, we "give no deference to the jury's choice between reasonable inferences." *Id.* "The State's circumstantial evidence is sufficient when the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* (citation omitted) (internal quotation marks omitted).

We begin our analysis by identifying the circumstances proved regarding S.Y.'s fear of imminent great bodily harm. Those circumstances are as follows:

Nyonteh first sexually penetrated S.Y. when she was 14 years old. She awoke to Nyonteh's fingers "in [her] private part." The following day, Nyonteh told S.Y. that he had joined a cult and that in order to survive, "he had to have sex with somebody who is still a virgin." He told S.Y. that the cult threatened to kill Nyonteh, S.Y., or her family members if Nyonteh did not have sexual intercourse with S.Y. This scared S.Y.

S.Y. initially said no to Nyonteh's requests for sex. A few weeks after Nyonteh's initial sexual assault, S.Y. began receiving text messages from unknown phone numbers

20

each time she denied Nyonteh's sexual advances. These text messages threatened that, if S.Y. did not submit to Nyonteh's advances, she, her mother P.Y., her biological father, and her siblings would be hurt or be killed. S.Y. felt "really scared" as a result of these messages.

While S.Y. was still 14 years old, Nyonteh penetrated S.Y.'s vagina with his penis. S.Y. cried and was in pain.

Text messages from unknown phone numbers threatened S.Y. that if she did not have sex with Nyonteh, or if she disclosed the abuse, she or P.Y. would die in a car crash. Sometimes, the texts would instruct S.Y. to have sex with Nyonteh immediately in a specific room or else she or her mother would die in a car crash.

S.Y. received texts from unknown phone numbers that included photos of her family, of her family's cars, of her home, and of her bedroom. These messages made S.Y. feel even more fearful. Specifically, she feared that the individuals who were threatening her were nearby.

S.Y. once told Nyonteh that she planned to tell P.Y. about the sexual abuse. Shortly after this conversation, S.Y. received a text message stating that if she told P.Y., both S.Y. and P.Y. would die.

On one occasion, S.Y. replied to a text from an unknown number, stating that she would no longer have sex with Nyonteh. In response, she received a photo of her biological father and a threat that, if she did not continue to submit to Nyonteh, the cult would hurt her father.

21

Shortly before S.Y. told her mother about Nyonteh's sexual abuse, Nyonteh staged a burglary of the family home. S.Y. woke up in the middle of the night to find the front door open and belongings strewn about.

A few days later, S.Y. received text messages from an unknown number indicating that she needed to have sex with Nyonteh to settle her "account" with the cult. The messages stated that if S.Y. did not do so by a given deadline, the account would remain open, and she would "have to do everything no matter what."

When S.Y. told her mother about the sexual abuse days after the messages directed her to settle her "account," S.Y. asked her mother not to confront Nyonteh. S.Y. explained that she was scared "they were going to do something to us . . . [b]ecause [S.Y.] kept on getting threats that if [she] told, they were going to do something to" her family.

P.Y. reported the sexual abuse to the police. When officers arrived at the family home, S.Y. cried and was afraid to tell the police about the abuse. She feared that the cult would follow through on their threats to hurt or kill her family.

Having identified the circumstances proved, the next step of the sufficiency-of-the-evidence analysis requires us to examine the reasonable inferences from these circumstances and determine whether they are "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Segura*, 2 N.W.3d at 155 (citation omitted) (internal quotation marks omitted). Nyonteh challenges the sufficiency of the evidence as to only one element of first-degree criminal sexual conduct—whether the "circumstances existing at the time of the [sexual penetration]"

caused "[S.Y.] to have a reasonable fear of imminent great bodily harm to [herself] or another." *See* Minn. Stat. § 609.342, subd. 1a(a).

Nyonteh concedes that the State's circumstantial evidence supports the reasonable inference that S.Y. may have believed she or others would suffer great bodily harm if she refused Nyonteh's sexual assaults. But he contends that the evidence was insufficient to prove that she believed the great bodily harm would be "imminent." Nyonteh asks us to apply a dictionary definition of "imminent" that defines the term as meaning "immediate." Notably, Nyonteh's jury was instructed that imminent means "immediate," consistent with the pattern jury instruction that was in effect at the time of Nyonteh's trial. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 12.03 (6th ed. Supp. 2022–2023) (issued in October 2022) (stating that " '[t]o fear imminent great bodily harm' means that the person must fear that such harm will occur *immediately*").[7]

The State, on the other hand, cites another dictionary that defines the word "imminent" as "impending" or "about to occur." It argues that "imminent" does not mean "immediate," and to sustain Nyonteh's conviction, we need not determine that S.Y. feared "immediate" great bodily harm to herself or another.

---

[7]    This version of the jury instruction existed until November 2024, when it was modified to remove the definition of imminent. *Compare* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 12.01 (7th ed. 2023) (issued in December 2023) (still including, " 'To fear imminent great bodily harm' means that the person must fear that such harm will occur immediately."), *with* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 12.01 (7th ed. 2024) (published in November 2024) (no longer defining "imminent").

Whether the term "imminent" in the first-degree criminal sexual conduct statute means "immediate" or "impending" is immaterial here. Under either definition advanced by the parties, the trial evidence supports just one reasonable hypothesis—when Nyonteh sexually penetrated S.Y., the circumstances caused her to reasonably fear imminent great bodily harm to herself or others. The evidence of Nyonteh's persistent and specific threats to S.Y. about the great bodily harm that would occur to her or her family members—threats that were sometimes accompanied by photos suggesting that the violence could immediately occur—established beyond a reasonable doubt that S.Y. reasonably feared imminent great bodily harm to herself or her family members. Nyonteh's conduct made S.Y. fearful of both immediate and impending great bodily harm. And the circumstances proved are inconsistent with any rationale hypothesis that this teenager only believed that the harm would occur later. Accordingly, we conclude that the trial evidence was sufficient to prove that Nyonteh committed the offense of first-degree criminal sexual conduct against S.Y.

## III.

Nyonteh argues that the district court erred by entering convictions for first-degree domestic abuse murder and second-degree intentional murder, in addition to his conviction for first-degree premeditated murder. He contends that these convictions violate the proscription against multiple convictions for the same conduct against the same victim. The State agrees.

The jury found Nyonteh guilty of first-degree premeditated murder, first-degree domestic abuse murder, and second-degree intentional murder for the death of P.Y.

24

Although the district court did not enter convictions for first-degree domestic abuse murder or second-degree intentional murder orally on the record, Nyonteh's warrant of commitment includes convictions for all three offenses.

"Minnesota law protects defendants against duplicative convictions . . . for the same conduct." *Tichich v. State*, 4 N.W.3d 114, 124 (Minn. 2024). The district court may not convict a defendant of "two counts of first-degree murder when both convictions are for the same offense, are on the basis of the same act, and involve the same victim." *State v. Balandin*, 944 N.W.2d 204, 222 (Minn. 2020) (citation omitted) (internal quotation marks omitted). Additionally, a defendant may not be convicted of both first-degree murder and a lesser degree of murder for the same conduct involving the same victim. Minn. Stat. § 609.04, subd. 1 (2024) (stating that a defendant "may be convicted of either the crime charged or an included offense, but not both"); *State v. Zumberge*, 888 N.W.2d 688, 697 (Minn. 2017) ("[E]very lesser degree of murder is an included offense.").

Because Nyonteh's charges for first-degree premeditated murder, first-degree domestic abuse murder, and second-degree intentional murder were for the same conduct involving the same victim—P.Y.—the district court erred by entering convictions for all three offenses in the warrant of commitment. *E.g.*, *State v. Johnson*, 773 N.W.2d 81, 89 (Minn. 2009) (concluding that the district court erred when it entered two first-degree murder convictions and one second-degree murder conviction for the same conduct involving the same victim). We therefore reverse in part and remand to the district court to vacate Nyonteh's additional convictions for first-degree domestic abuse murder and second-degree intentional murder.

25

## IV.

Finally, we turn to the arguments raised by Nyonteh in his pro se supplemental brief. "Claims in a pro se supplemental brief that are unsupported by either arguments or citation to legal authority are forfeited." *State v. Montano*, 956 N.W.2d 643, 650 (Minn. 2021) (citations omitted) (internal quotation marks omitted).

In his pro se supplemental brief, Nyonteh first claims that the district court erred by denying him the right to represent himself. The record shows that before Nyonteh's trial commenced, he wrote a letter to the district court inquiring about representing himself, among other things. After receiving Nyonteh's letter, the district court addressed Nyonteh's inquiry about self-representation on the record. The district court stated, "I did receive correspondence from the defendant. . . . It's my understanding . . . that . . . at this point there is no pro se motion." Nyonteh's attorney confirmed that the district court's understanding was correct. Nyonteh did not renew his inquiry about representing himself or ultimately move to represent himself.

Given these circumstances, where Nyonteh did not assert his right to self-representation, he forfeited any claim that the district court denied his right to self-representation. *See State v. Kelley*, 855 N.W.2d 269, 278 (Minn. 2014) (stating that a party forfeits a right when they fail to timely assert it). Moreover, beyond stating that the district court deprived him of his right to represent himself, Nyonteh's pro se supplemental brief does not include any argument or citation to legal authority to support this claim. *See Montano*, 956 N.W.2d at 650. Accordingly, we decline to address it.

Nyonteh also alleges in his pro se supplemental brief that he received ineffective assistance of trial counsel. Again, however, we decline to address this claim because Nyonteh does not identify any specific conduct by his attorney, and he does not include argument or citation to legal authority.

## CONCLUSION

For the foregoing reasons, we affirm Nyonteh's convictions for first-degree premeditated murder and first-degree criminal sexual conduct, but we reverse his additional convictions for first-degree domestic abuse murder and second-degree intentional murder and remand to the district court to vacate those convictions.

Affirmed in part, reversed in part, and remanded.